1   BROWNE GEORGE ROSS LLP
    Keith J. Wesley (State Bar No. 229276)
2     kwesley@bgrfirm.com
    Matthew L. Venezia (State Bar No. 313812)
3     mvenezia@bgrfirm.com
    2121 Avenue of the Stars, Suite 2800
4   Los Angeles, California 90067
    Telephone: (310) 274-7100
5   Facsimile: (310) 275-5697

6   Attorneys for Plaintiff
    Atari Interactive, Inc.

7

8                   UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

10

11  ATARI INTERACTIVE, INC.,          Case No. 4:18-cv-03451-JST

12          Plaintiff,                 *[Related to Case Nos. 3:18-cv-03843-JST; 3:18-cv-04115; 4:18-cv-04949-JST; and 4:19-cv-00264-JST]*

13          vs.

14  REDBUBBLE, INC.,                   Judge:    Hon. Jon S. Tigar

15          Defendant.
                                       **ATARI INTERACTIVE, INC.'S**
16                                     **STATEMENT OF RECENT DECISION**
    AND RELATED ACTIONS

17

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Local Rule 7-3(d)(2), plaintiff Atari Interactive, Inc. hereby respectfully submits for the Court's consideration the decision concerning Amazon's liability for goods sold on its website reached in *Bolger v. Amazon.com, LLC*, Case No. D075738 before the Court of Appeal for the State of California. A copy of this opinion is attached hereto as "**Exhibit A**."

Dated:  August 14, 2020

BROWNE GEORGE ROSS LLP
Keith J. Wesley
Matthew L. Venezia

By:    _/s/ Matthew L. Venezia_
Matthew L. Venezia
Attorneys for Plaintiff Atari Interactive, Inc.

# EXHIBIT A

Filed 8/13/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGELA BOLGER, | D075738 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2017-00003009-CU-PL-CTL) |
| AMAZON.COM, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Reversed with directions.

Casey, Gerry, Schenk, Francavilla, Blatt & Penfield, Thomas D. Luneau, Jeremy Robinson, and Jillian F. Hayes, for Plaintiff and Appellant.

Lieff Cabraser Heimann & Bernstein, Jonathan D. Selbin and Evan J. Ballan, for Public Justice, as Amicus Curiae on behalf of Plaintiff and Appellant.

Siminou Appeals and Benjamin I. Siminou, for the Consumer Attorneys of California, as Amicus Curiae on behalf of Plaintiff and Appellant.

Perkins Coie, Julie L. Hussey, Julian Feldbein-Vinderman and W. Brendan Murphy, for Defendant and Respondent.

Baker Botts, Christopher J. Carr and Navi Singh Dhillon, for the Chamber of Commerce of the United States of America, as Amicus Curiae on behalf of Defendant and Respondent.

Plaintiff Angela Bolger bought a replacement laptop computer battery on Amazon, the popular online shopping website operated by defendant Amazon.com, LLC.  The Amazon listing for the battery identified the seller as "E-Life," a fictitious name used on Amazon by Lenoge Technology (HK) Ltd. (Lenoge).  Amazon charged Bolger for the purchase, retrieved the laptop battery from its location in an Amazon warehouse, prepared the battery for shipment in Amazon-branded packaging, and sent it to Bolger.  Bolger alleges the battery exploded several months later, and she suffered severe burns as a result.

Bolger sued Amazon and several other defendants, including Lenoge. She alleged causes of action for strict products liability, negligent products liability, breach of implied warranty, breach of express warranty, and "negligence/negligent undertaking."  Lenoge was served but did not appear, so the trial court entered its default.

Amazon moved for summary judgment.  It primarily argued that the doctrine of strict products liability, as well as any similar tort theory, did not apply to it because it did not distribute, manufacture, or sell the product in question.  It claimed its website was an "online marketplace" and E-Life (Lenoge) was the product seller, not Amazon.  The trial court agreed, granted Amazon's motion, and entered judgment accordingly.

Bolger appeals.  She argues that Amazon is strictly liable for defective products offered on its website by third-party sellers like Lenoge.  In the circumstances of this case, we agree.

As a factual and legal matter, Amazon placed itself between Lenoge and Bolger in the chain of distribution of the product at issue here.  Amazon accepted possession of the product from Lenoge, stored it in an Amazon warehouse, attracted Bolger to the Amazon website, provided her with a product listing for Lenoge's product, received her payment for the product, and shipped the product in Amazon packaging to her.  Amazon set the terms of its relationship with Lenoge, controlled the conditions of Lenoge's offer for sale on Amazon, limited Lenoge's access to Amazon's customer information, forced Lenoge to communicate with customers through Amazon, and demanded indemnification as well as substantial fees on each purchase.  Whatever term we use to describe Amazon's role, be it "retailer," "distributor," or merely "facilitator," it was pivotal in bringing the product here to the consumer.

Strict products liability "was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies."  (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 733 (*Daly*).)  It "arose from dissatisfaction with the wooden formalisms of traditional tort and contract principles in order to protect the consumer of manufactured goods."  (*Id*. at p. 735.)  The scope of strict liability has been expanded, where necessary, to account for "market realities" and to cover new transactions in "widespread use . . . in today's business world."  (*Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 252 (*Price*).)

The structure of Amazon's relationship with Lenoge, on one hand, and Bolger, on the other, presents just such a new transaction now in widespread use.  We must therefore return to the principles underlying the doctrine of strict products liability to determine whether it applies.  (See *O'Neil v. Crane*

*Co.* (2012) 53 Cal.4th 335, 362 (*O'Neil*); *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 479-480 (*Jimenez*).)  Those principles compel the application of the doctrine to Amazon under the circumstances here.  As noted, Amazon is a direct link in the chain of distribution, acting as a powerful intermediary between the third-party seller and the consumer.  Amazon is the only member of the enterprise reasonably available to an injured consumer in some cases, it plays a substantial part in ensuring the products listed on its website are safe, it can and does exert pressure on upstream distributors (like Lenoge) to enhance safety, and it has the ability to adjust the cost of liability between itself and its third-party sellers.  Under established principles of strict liability, Amazon should be held liable if a product sold through its website turns out to be defective.  (See *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262 (*Vandermark*).)  Strict liability here "affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship."  (*Id*. at pp. 262-263.)

We further conclude Amazon is not shielded from liability by title 47 United States Code section 230.  That section, enacted as part of the Communications Decency Act of 1996 (CDA; Pub.L. No. 104-104, tit. V (Feb. 8, 1996) 110 Stat. 56), generally prevents internet service providers from being held liable as a speaker or publisher of third-party content.  It does not apply here because Bolger's strict liability claims depend on Amazon's own activities, not its status as a speaker or publisher of content provided by Lenoge for its product listing.

We therefore reverse the trial court's judgment in favor of Amazon.  On remand, the court shall vacate its order granting Amazon's motion for

summary judgment and enter an order granting the motion in part and denying it in part, as discussed more fully below.

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review of orders granting summary judgment, we recite the historical facts in the light most favorable to Bolger as the nonmoving party.  (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*); *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 81.)

Many readers of this opinion are likely familiar with the Amazon website.  It is the world's most popular e-commerce website.  In the United States, approximately half of all online shopping dollars are spent on Amazon.  The Amazon website is, in some sense, " 'the world's largest store' " in the Internet age.

Products sold on the Amazon website fall into two general categories. In one category are the products Amazon itself selects, buys from manufacturers or distributors, and sells to consumers at a price established by Amazon.  These products, which make up approximately 40 percent of the website's sales, are not at issue in this appeal.  In the second category are the products ostensibly sold by third parties through Amazon's website.  These "third-party sellers" select their own products, source them from manufacturers or distributors, set the purchase price, and use Amazon's website to reach consumers.  They pay either a monthly fee or a per item fee for the opportunity to sell on Amazon's website.

The product listings for the two categories are often similar.  The main distinction is that products not sold directly by Amazon include the words "Sold by" and the name of the third-party seller instead of Amazon.  An example third-party listing appears below.  It was reproduced in an e-

commerce expert declaration submitted by Bolger in opposition to Amazon's motion for summary judgment.  The "Sold by" notation is included on the right side of the listing.



To purchase a product offered by a third-party seller, the customer adds it to his or her Amazon cart.  At checkout, the order confirmation page again identifies the product as "Sold by" the third-party seller.  To complete the purchase, Amazon charges the customer's credit card or other payment information in its files.  Amazon informs sellers it will "collect all Sales Proceeds for each of these transactions and will have the exclusive rights to do so[.]"  Amazon accepts the risk that the customer's payment information will turn out to be fraudulent.  After Amazon collects the payment, it deducts a referral fee (and other potential fees, discussed below), aggregates the

remaining proceeds with those from other purchases, and remits them to the third-party seller on a periodic basis.[1]

Some third-party sellers participate in the "Fulfilled by Amazon" (FBA) program.  The FBA program allows third-party sellers to reach customers on a global basis.  Third-party sellers must apply to register any product included in the FBA program, and Amazon may refuse registration for various reasons.  Bolger's e-commerce expert described the FBA program as follows:  "This service allowed companies and individuals with products to sell to ship the products to Amazon's warehouses; these products would be presented for sale within the Amazon.com Web site, and, if and when sold, would be shipped by Amazon to the buyer."  Amazon may ship a product offered by one third-party seller together with products offered by other third-party sellers or by Amazon itself.  Amazon controls the packaging for the shipment, which may include Amazon branding and Amazon-specific messaging.

To return an FBA product, the customer ships it back to Amazon, not the third-party seller.  Amazon inspects the product and determines whether the product can be resold.  If so, it will return it to the third-party seller's inventory at the Amazon warehouse.  If not, the third-party seller can have it sent back to its own facilities.

In the FBA program, as Bolger's expert explained, "Amazon 'owns' the customer.  This means that Amazon owns and controls the relationship with

---

[1]     Although Amazon normally remits the sales proceeds on a schedule, it reserves the right to withhold or delay payment if it concludes the third-party seller's actions or performance "may result in customer disputes, chargebacks or other claims" related to its Amazon sales.  Amazon also requires sellers to provide bank account and credit card information, which Amazon may use to obtain any amounts payable by the seller to Amazon.

the buyer; the individual or company supplying products to the FBA program does not.  The supplier has no direct relationship with the buyer, and indeed in most cases does not even have an indirect relationship with the buyer.  That is, in most cases there are no communications between FBA supplier and buyer; the FBA supplier simply discovers in a report or some other form of notification that a product has been sold to the buyer."  Amazon does not contact the seller for approval of the purchase; Amazon itself decides whether to allow the transaction to go through.

Bolger's expert continued, "On occasions when communications between FBA suppliers and buyers, or between FBA suppliers and potential buyers, is necessary—when, for instance, a buyer has a problem with the product or a potential buyer has a pre-purchase question—communication is 'anonymized.'  That is, Amazon provides a message console on the Amazon Marketplace Web site that sends messages between the two parties['] e-mail addresses, though neither party is provided with the other party's actual email address."  Amazon requires third-party sellers to use only the tools and methods designated by Amazon to communicate with Amazon customers.  Amazon prohibits third-party sellers from contacting customers to collect payments or influence their purchasing decisions.  Indeed, third-party sellers may not use Amazon customer or transaction information "for any marketing or promotional purposes whatsoever."

Third-party sellers in the FBA program pay storage and fulfillment fees to Amazon, in addition to the general seller and referral fees paid by all third-party sellers.  Amazon assesses still other fees in specific circumstances, such as for processing returns.  Third-party sellers can also use the FBA program to fulfill orders placed through non-Amazon channels.

8

Amazon's contractual relationship with its third-party sellers is governed by its Business Solutions Agreement (BSA), which Amazon requires all third-party sellers to accept. The BSA states that Amazon and a third-party seller are independent contractors, with no agency or employment relationship. Under the BSA, a third-party seller must represent that it is a duly organized business existing in good standing and will comply with all applicable laws. A third-party seller must indemnify Amazon for any claim related to its products sold through Amazon. If its sales are above a certain threshold, a third-party seller must obtain general commercial liability insurance, listing Amazon as an additional named insured.

The BSA prohibits third-party sellers from offering certain products through the Amazon website (the products are either restricted altogether, or may be sold only with Amazon's permission). It also generally prohibits sellers from listing a product at a higher price than the seller offers through other channels. If a third-party seller violates Amazon's policies or applicable law, Amazon may take corrective action, including suspending the seller, destroying inventory without compensation, and permanently withholding payments.

Amazon provides its customers with an "A-to-z Guarantee" for purchases made on its website, including from third-party sellers. The guarantee states, "We want you to buy with confidence anytime you make a purchase on the Amazon.com website or use Amazon Pay; that's why we guarantee purchases from third-party sellers when payment is made via the Amazon.com website . . . .  The condition of the item you buy and its timely delivery are guaranteed under the Amazon A-to-z Guarantee." The A-to-z Guarantee covers defective products sold by third-party sellers. If a customer encounters a problem, he or she is required to attempt to contact the third-

9

party seller through Amazon, but if the third-party seller does not respond, Amazon will refund the customer the product cost, the original shipping cost, and the return shipping cost. Amazon may seek reimbursement of this refund from the third-party seller.

In addition, Amazon attempts to ensure the products offered by third-party sellers are safe. Amazon states that customer safety is a top priority. As Amazon's person-most-knowledgeable explained at his deposition, "[W]e've got a long and well-developed product-safety process, and that starts from the very beginning. When a third-party seller signs up to sell on the platform, they have to agree to the [BSA], which contains very clearly language that says they have to sell products that meet all the compliance requirements for the jurisdictions that they're going to be selling the product in. [¶] Once products are being sold, we have a robust and active process to monitor for any customer complaints that come in. Regardless of the format that those come in, we track those, we log those, we report those things to [the Consumer Products Safety Commission]. [¶] And as—depending on the severity of the scope, the frequency, variety of factors, we will decide whether or not we're going to continue to sell a particular product or not. And that's an ongoing process. That happens every single day for every single product on the website . . . ." Later, he stated, "You know, Amazon does everything in its power and goes above and beyond to make sure that we're providing the best customer experience, including safe products. And, you know, I want

that for all of our customers and for myself when I buy from Amazon, so I hope people believe that."[2]

Lenoge registered with Amazon as a third-party seller in December 2012. It chose to use the name "E-Life" on Amazon. Amazon's person-most-knowledgeable explained, "Sellers oftentimes don't want to use whatever the corporate entity name is, so they're allowed to specify a display name or a friendly name." Lenoge participated in Amazon's FBA program and later, pursuant to that program, offered the laptop battery at issue here for sale.

Bolger was part of Amazon's membership program, Amazon Prime, and often purchased products on Amazon. In August 2016, Bolger searched for replacement laptop batteries on the Internet, followed a link to Amazon's website, and purchased the Lenoge battery. Amazon charged her credit card for the $12.30 purchase price. The battery was stored at an Amazon fulfillment center in Oakland, California. Because Bolger was an Amazon Prime member, Amazon sent her the battery via free two-day shipping. She received the battery a few days later in Amazon packaging, including an Amazon-branded box with Amazon-branded shipping tape. Throughout the process, Bolger had no contact with Lenoge or anyone other than Amazon. She believed Amazon sold her the battery. Amazon's total fee for the transaction was $4.87, or approximately 40 percent of the purchase price.

---

[2]     Perhaps contradictorily, Amazon's consumer "Conditions of Use" state, "Parties other than Amazon operate stores, provide services, or sell product lines through the Amazon Services. . . . We are not responsible for examining or evaluating, and we do not warrant the offerings of, any of these businesses or individuals or the content of their Web sites. Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties." The conditions go on to inform customers, in all capital letters, that "YOU EXPRESSLY AGREE THAT YOUR USE OF THE AMAZON SERVICES IS AT YOUR SOLE RISK."

The next month, Amazon suspended Lenoge's selling privileges because it became aware of a "grouping" of safety reports on Lenoge's laptop batteries and Lenoge did not respond to Amazon's requests for documentation.  Three weeks later, Amazon permanently blocked Lenoge's account.

Less than a month after Amazon permanently blocked Lenoge's account, Bolger was using her laptop when the replacement battery exploded.  Bolger suffered serious burns and was hospitalized for two weeks.

Bolger filed this lawsuit in January 2017.  As noted, her operative complaint alleges causes of action for strict products liability, negligent products liability, breach of implied warranty, breach of express warranty, and "negligence/negligent undertaking."  She named Amazon and several other companies allegedly involved in the design, manufacture, distribution, or sale of the battery as defendants.  Eventually Bolger added Lenoge as a defendant as well.  She served Lenoge with her complaint, but it did not appear.  The trial court entered its default.  Another defendant, Herocell Inc., was also served and defaulted.  Yet another defendant, Shenzhen Uni-Sun Electronics Co., is located in the People's Republic of China.  Bolger initiated service of process but was informed it could take two to three years to complete.

Bolger's lawsuit was the first safety report Amazon received for the specific replacement battery model Bolger purchased.  Soon after Bolger filed her complaint, Amazon "suppressed" the listing for the battery, i.e., it could no longer be offered for sale on Amazon.  It is Amazon's standard practice to "purge" or destroy inventory in its possession for a product that has been suppressed.

Three months later, Amazon sent Bolger an email warning her that Amazon had learned that the Lenoge replacement battery "may present a fire

hazard or not perform as expected[.]"  The email advised, "If you still have this product, we strongly recommend that you stop using the item immediately."  It directed her to dispose of the battery at a recycling center or waste disposal facility.  The email informed her that Amazon had provided a credit of the purchase price to her Amazon account.  It concluded, "We trust you will understand the safety and satisfaction of our customers is our highest priority.  [¶]  Thanks for shopping at Amazon.com."  The email was apparently sent to other customers who had purchased the battery as well.[3]

After almost two years of litigation, Amazon filed its motion for summary judgment.  It primarily argued that it could not be held liable for defects in the replacement battery because it did not manufacture, distribute, or sell the battery to Bolger.  It claimed it was merely a provider of services, namely an online marketplace and logistics operation.  Amazon also argued

_____

[3]     Amazon's person-most-knowledgeable explained, "So as part of ongoing analysis of various products on the website, the safety team decided to—started to look at laptop batteries specifically.  And rather than looking at just [product] by [product], they started to aggregate across other, you know, vectors including seller.  They found there was a pattern with certain batteries and sellers of complaints.  [¶]  And so as a result of that for those specific sellers and [products], they made the decision to message customers and let them know that there was potential safety concerns and that we were refunding their money."  Amazon now requires additional documentation, including Underwriters Laboratories certification, from new sellers who would like to offer replacement batteries on Amazon.

that the CDA shielded it from liability because Bolger's causes of action were based on Amazon's publication of Lenoge's sales listing.[4]

In support of its motion, Amazon submitted documentation of Bolger's purchase, the BSA, Amazon's consumer "Conditions of Use," and its A-to-z Guarantee.  It also submitted a declaration from an Amazon senior manager responsible for product safety, investigations, and recalls.  The manager described Amazon's business and the Lenoge battery transaction at issue. She stated, "Amazon operates an online marketplace at www.amazon.com. Though Amazon retails some products on its marketplace, the marketplace has more than a million third-party sellers selling their own products." Specifically, she explained, "E-life sourced the battery from the manufacturer or upstream distributors, sold the battery to [Bolger], set the price, provided any warranty, and controlled the terms of its offer.  Amazon did not design or manufacture the product, sell or distribute the battery, set the price, provide a warranty, or control the terms of the product offer.  Similarly, Amazon was not involved in sourcing the subject battery from the manufacturer or upstream distributor."  The manager asserted that "E-life retained title to the battery at all times," and "E-life was also responsible for ensuring the battery that it sold to [Bolger] was properly packaged and complied with all applicable laws."  The manager acknowledged Amazon's A-to-z Guarantee,

---

[4]    Amazon challenged Bolger's cause of action for negligent undertaking on the additional grounds that it had no duty to warn Bolger of safety issues with Lenoge's replacement batteries, that Bolger did not rely on any allegedly negligent undertaking by Amazon, and that Amazon's suspension of Lenoge's selling privileges did not increase the risk of harm to Bolger.  Bolger does not challenge the trial court's order to the extent it summarily adjudicated her negligent undertaking cause of action in Amazon's favor.  (See fn. 12, *post*.)

but she denied it was a warranty.  She stated, "The only warranty provided for a product comes from the third-party seller."

Bolger opposed Amazon's summary judgment motion.  She argued that, regardless whether Amazon was technically the seller of the replacement battery, it was part of the chain of production and distribution and therefore strictly liable for any defects.  Bolger further argued that, even if Amazon were not part of the chain of production and distribution, it was liable under California's marketing enterprise doctrine.  (See *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 776 (*Bay Summit*).)  Bolger disagreed that the CDA applied to shield Amazon from liability.

Bolger submitted several declarations, including her own, in opposition to Amazon's motion.  Two of the declarations were from retained expert witnesses, one in the field of e-commerce and the other in the field of engineering.  Bolger also submitted excerpts from the deposition transcripts of several Amazon employees, including its designated person-most-knowledgeable.[5]

After hearing argument, the trial court granted Amazon's motion for summary judgment.  It found that Amazon was not strictly liable for defective products offered by third-party sellers on its website.  Amazon was not a seller or distributor of the replacement laptop battery.  Instead, it was a "provider of services by maintaining an online marketplace, warehousing and

---

[5]     Amazon objected on various grounds to much of Bolger's evidence.  The trial court sustained a number of these objections, including to portions of Bolger's e-commerce expert declaration and the entirety of Bolger's engineering expert declaration.  Bolger has not challenged these evidentiary rulings on appeal.  We therefore do not consider the merits of these rulings, and we likewise do not consider any evidence to which objections were sustained.  (See *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 (*Frittelli*).)

shipping goods and processing payments."  The court also found that Amazon was not strictly liable under the marketing enterprise doctrine.  It likewise found that Bolger's warranty and negligent undertaking claims had no merit, and Bolger had not offered any contrary arguments.  The court entered judgment in favor of Amazon, and Bolger now appeals.

DISCUSSION

I

*Summary Judgment Standards*

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law.  [Citation.]  The burden of persuasion remains with the party moving for summary judgment.  [Citation.]  When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' "  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*).)

If the defendant "carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  "The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth

16

the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ."  (Code Civ. Proc., § 437c, subd. (p)(2).)

"We review the record and the determination of the trial court de novo." (*Kahn*, *supra*, 31 Cal.4th at p. 1003.)  "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (*Saelzler*, *supra*, 25 Cal.4th at p. 768.)

## II

### *Strict Products Liability*

"[T]he concept of strict products liability was created and shaped judicially.  In its evolution, the doctrinal encumbrances of contract and warranty, and the traditional elements of negligence, were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability."  (*Daly*, *supra*, 20 Cal.3d at p. 733.)  Our Supreme Court first recognized the doctrine of strict liability for defective products more than 50 years ago.  (See *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 (*Greenman*).)  Initially limited to manufacturers, the doctrine reflected judicial concern that "the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market, rather than by the injured persons who are powerless to protect themselves."  (*Id.* at p. 63.)

Soon after, the Supreme Court extended strict liability to retailers: "Retailers like manufacturers are engaged in the business of distributing goods to the public.  They are an integral part of the overall producing and

17

marketing enterprise that should bear the cost of injuries resulting from defective products.  [Citation.]  In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff.  In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety.  Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship."  (*Vandermark*, *supra*, 61 Cal.2d at pp. 262-263.)

Our Supreme Court has "given [the] rule of strict liability a broad application."  (*Price*, *supra*, 2 Cal.3d at p. 250.)  "Such a broad philosophy evolves naturally from the purpose of imposing strict liability . . . .  Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them."  (*Id*. at p. 251, fn. omitted.)  In its first decade, the rule was made applicable to numerous businesses in the chain of distribution of a product, including bailors and lessors, wholesalers and distributors, and sellers of mass-produced homes.  (*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130 (*Cronin*).)

Interpreting these foundational precedents, courts have generally applied the doctrine of strict products liability to entities "involved in the vertical distribution of consumer goods," where the policies of the doctrine support its application.  (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773.)  "Although these defendants were not necessarily involved in the manufacture or design of the final product, each was responsible for passing the product

18

down the line to the consumer.  Thus, the parties were 'able to bear the cost of compensating for injuries' [citation] and 'play[ed] a substantial part in insuring that the product [was] safe or . . . [were] in a position to exert pressure on the manufacturer to that end.' " (*Ibid*.)  "Beyond manufacturers, anyone identifiable as 'an integral part of the overall producing and marketing enterprise' is subject to strict liability." (*Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1534 (*Arriaga*).)

The doctrine of strict products liability, while broad, is not unlimited. It does not cover injuries caused by a defective product in all situations where the product was in some sense distributed or provided by the defendant.  For example, in *Peterson v. Superior Court* (1995) 10 Cal.4th 1185 (*Peterson*), our Supreme Court rejected prior precedent extending the doctrine to hotel proprietors and residential landlords whose guests or tenants are injured by a defect in the leased dwelling or other premises.  (*Id*. at p. 1210.)  And courts have repeatedly found that dealers in used products are not strictly liable for defects in those products, unless they rebuild or recondition them and thereby assume a role analogous to a manufacturer.  (*Id*. at pp. 1201-1202 [discussing cases].)

"[R]ecovery under the doctrine of strict liability is limited solely to 'physical harm to person or property.'  [Citation.]  Damages available under strict products liability do not include economic loss, which includes ' " 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property . . . .' " ' " (*Jimenez*, *supra*, 29 Cal.4th at p. 482.)

To determine whether the doctrine of strict products liability should be applied in a situation that has not been considered by previous precedents,

19

California courts primarily look to the purposes of the doctrine.  (*O'Neil*, *supra*, 53 Cal.4th at p. 362.)  "The strict liability doctrine derives from judicially perceived public policy considerations, i.e., enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants.  [Citations.]  Where these policy justifications are not applicable, the courts have refused to hold the defendant strictly liable even if that defendant could technically be viewed as a ' "link in the chain" ' in getting the product to the consumer market.  [Citation.]  In other words, the facts must establish a sufficient causative relationship or connection between the defendant and the product so as to satisfy the policies underlying the strict liability doctrine."  (*Arriaga*, *supra*, 167 Cal.App.4th at p. 1535.)

Although the precise transaction at issue here is a matter of first impression in California, two analogous (albeit substantially pre-Internet) cases are instructive:  *Canifax v. Hercules Powder Co.* (1965) 237 Cal.App.2d 44 (*Canifax*) and *Barth v. B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 (*Barth*).

In *Canifax*, the plaintiff was injured when an allegedly defective fuse caused dynamite to accidentally explode during excavation of an underground tunnel.  (*Canifax*, *supra*, 237 Cal.App.2d at pp. 46-47.)  The defendant acted as an intermediary between the "jobber" who sold the fuse and the manufacturer.  (*Id*. at pp. 47-48.)  The customer purchased the fuse (and related supplies) from the jobber, who in turn placed an order with the defendant.  (*Ibid*.)  The defendant passed on the order for the fuse to the manufacturer, who shipped the fuse directly to the jobber.  (*Id*. at p. 48.)  "[Defendant] never had possession of the fuse.  It did, however, 'subsequently . . . bill the customer and pay the manufacturer's invoice.' " (*Ibid*.)

20

The appellate court held that the rule of strict products liability applies "to 'any person engaged in the business of selling,' and therefore applies not only to manufacturers but 'to any wholesale or retail dealer or distributor.' Thus, with the operations of [the defendant] described, it should undoubtedly be included within the rule.  The fact that it chooses to delegate the manufacture of [the] fuse to another and that it causes the manufacturer to ship the product directly to the consumer cannot be an escape hatch to avoid liability." (*Canifax*, *supra*, 237 Cal.App.2d at p. 52, quoting Rest.2d Torts, § 402A, com. f.)

Like the defendant in *Canifax*, Amazon acted as an intermediary between an upstream supplier and the ultimate consumer.  Amazon accepted an order for a product, billed the consumer, and remitted the proceeds to the upstream supplier.  Indeed, in this case Amazon went further.  It took possession of the product, so it fulfilled the consumer's order directly.

In *Barth*, a woman was killed and her passengers injured when the station wagon the woman was driving crashed, allegedly as a result of a defective tire.  (*Barth*, *supra*, 265 Cal.App.2d at pp. 233-234.)  The station wagon had been provided to the woman's husband by his employer.  (*Id*. at p. 234.)  The employer had an agreement with B.F. Goodrich to supply replacement tires, on a national basis, to the employer's fleet of vehicles.  (*Id*. at pp. 234, 248.)  When the station wagon needed new tires, the employer ordered them from Biltmore, a B.F. Goodrich distributor in the Midwest. (*Ibid*.)  Apparently because the station wagon was located in California, the employer requested that Biltmore "issue a draw number to B.F. Goodrich in San Francisco" for the replacement tires.  (*Id*. at p. 248.)  The husband received a purchase order to pick up the tires at Perry & Whitelaw, a wholesale and retail B.F. Goodrich distributor in San Francisco.  (*Id*. at

21

pp. 234, 248.)  Perry & Whitelaw retrieved two tires from its inventory and installed them on the station wagon.  (*Ibid*.)

Perry & Whitelaw was among several defendants in the resulting litigation.  (*Barth*, *supra*, 265 Cal.App.2d at p. 233.)  The appellate court summarized the mechanics of the transaction as follows:  "Perry & Whitelaw had received the Biltmore draw order, advising them to release the tires to [the employer].  Perry & Whitelaw's invoice indicated that the tires were sold to Goodrich, were to be delivered to [the employer], and charged to Biltmore. Perry & Whitelaw sent this invoice to Goodrich, who, in turn, billed Biltmore, and allowed Perry & Whitelaw a service charge for handling the transaction, as well as a credit for the tires removed from its stock."  (*Id*. at p. 249.)

In the trial court, the jury rejected plaintiffs' cause of action for strict products liability against Perry & Whitelaw.  (*Barth*, *supra*, 265 Cal.App.2d at p. 233.)  On appeal, the plaintiffs argued the trial court erred by instructing the jury that Perry & Whitelaw could be strictly liable only if it "sold" the tire in question to the employer.  (*Id*. at p. 250.)  The trial court defined a sale as " 'a transfer or an agreement to transfer goods to a buyer for a price.' "  (*Ibid*.)

The appellate court reversed the judgment.  (*Barth*, *supra*, 265 Cal.App.2d at p. 254.)  It held that a sale, as defined by the trial court, was not required for strict liability to apply.  (*Id*. at pp. 251-252.)  It explained that strict liability extended to "any person engaged in the business of selling products for use or consumption therefore including any manufacturer, wholesaler or retail dealer or distributor as well as operators of restaurants."  (*Id*. at pp. 250-251, citing Rest.2d Torts, § 420A, com. f, italics omitted.)  The appellate court concluded, "Clearly, Perry & Whitelaw was a distributor within the Restatement definition of the term seller for the

purpose of the application of the doctrine of strict liability and the [jury] instructions were erroneous." (*Id*. at p. 251.)

The appellate court specifically rejected Perry & Whitelaw's argument that "it was not a 'seller' of the tire to [the employer] but only served as a conduit for the sale that was made by Goodrich through Biltmore to [the employer]; that the situation is analogous to a transaction where Perry & Whitelaw merely installed a tire ordered by a customer from another retailer or wholesaler." (*Barth, supra*, 265 Cal.App.2d at p. 251.) The court held that "neither the transfer of title to the goods nor a sale is required" for strict liability to apply. (*Id*. at pp. 251-252.) Perry & Whitelaw retrieved the tires from its inventory and benefitted from the transaction in the form of a fee (service charge) from B.F. Goodrich, reimbursement for the tires, and the continued ability to service Goodrich's national accounts. (*Id*. at p. 252.)

Moreover, the rationale for the doctrine of strict liability supported its application to Perry & Whitelaw. (*Barth, supra*, 265 Cal.App.2d at pp. 252-253.) "[T]he reasons for placing losses due to defective products on the manufacturers and suppliers are to provide maximum protection for the consumer and the fact that the overall producing and marketing enterprise is in a better position to insure against the liability and to distribute it to the public by adding the cost thereof to the price of the product." (*Id*. at p. 253.) Citing *Canifax*, the court pointed out, "It is established that a wholesaler distributor who neither manufactures the product nor has possession of the goods can be held to the doctrine of strict liability." (*Ibid*.) In general, "all suppliers in the chain of getting goods from the manufacturer to the consumer should be held" strictly liable. (*Ibid*.)

Like the defendant in *Barth*, Amazon was a link in the chain of product distribution even if it was not a seller as commonly understood. Pursuant to

23

a contract with the seller, Amazon retrieved the product from its warehouse and supplied it to the consumer.  And again, Amazon went further.  Its business model compels the consumer to interact directly with Amazon, not the seller, to place the order for the product and pay the purchase price.

Ultimately, however, neither *Canifax* nor *Barth* fully anticipated the details of Amazon's involvement in the transaction at issue here.  Our review of the record shows that Amazon played an even more meaningful role in this transaction than the defendant in either of those earlier cases.

Amazon created the environment (its website) that allowed Lenoge to offer the replacement battery for sale.  Amazon attracted customers through its own activities, including its direct offers for sales and its Amazon Prime membership program, which includes benefits for some products offered by third-party sellers (including the Lenoge replacement battery at issue here).  Amazon set the terms of Lenoge's involvement, and it demanded fees in exchange for Lenoge's participation.  Amazon required Lenoge to indemnify it and, assuming Lenoge met the sales threshold, to obtain general commercial liability insurance listing Amazon as an additional named insured.  Because Lenoge participated in the FBA program, Amazon accepted possession of Lenoge's products, registered them in its inventory system, and stored them in an Amazon warehouse awaiting sale.  Amazon created the format for Lenoge's offer for sale and allowed Lenoge to use a fictitious name in its product listing.  The listing itself conforms to requirements set by Amazon.  Even setting aside the use of a fictitious name, the listing does not conspicuously inform the consumer of the identity of the third-party seller or the nature of Amazon's relationship to the sale.

To purchase the product, the consumer adds it to her Amazon cart, not her Lenoge or E-Life cart.  The consumer pays Amazon for the product, not

24

Lenoge or E-Life.  And, in the FBA program, Amazon personnel retrieve the product from its place in an Amazon warehouse and ship it to the consumer in Amazon-branded packaging.  If convenient, Amazon will ship the product together with products sold by other third-party sellers or by Amazon itself.

Lenoge is not involved in the sales transaction.  It does not approve the sale before it is made.  It may not even know a sale has occurred until it receives a report from Amazon.  It does not receive payment until Amazon chooses to remit the proceeds.  Its use of any customer or transaction information, if it even receives any from Amazon, is strictly limited.  But it accepts the burden of substantial fees for Amazon's participation, approximately 40 percent here.

If a customer wishes to return the product, she ships it back to Amazon under the FBA program.  Amazon personnel inspect the product, determine whether it can be resold, and if so return it to inventory in the Amazon warehouse.  Third-party sellers like Lenoge are prohibited from communicating with Amazon customers except through the Amazon website, where such interactions are anonymized.

Given these facts, Amazon is an "integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products."  (*Vandermark*, *supra*, 61 Cal.2d at p. 262.)  Amazon was "involved in the vertical distribution of consumer goods" and "responsible for passing the product down the line to the consumer."  (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773.)  It was one of the entities "responsible for placing a defective product into the stream of commerce."  (*O'Neil*, *supra*, 53 Cal.4th at p. 349.)  Amazon enabled Lenoge to offer the replacement battery for sale, inventoried and stored the replacement battery, accepted Bolger's order for the battery, billed Bolger the purchase price for the battery, received her

payment, retrieved the battery from its inventory, and shipped the battery to her in Amazon-branded packaging.

Our consideration of the policies underlying the doctrine of strict products liability confirm that the doctrine should apply here.  Amazon is " 'an integral part of the overall producing and marketing enterprise,' may in a particular case 'be the only member of that enterprise reasonably available to the injured plaintiff,' and may be in the best position to ensure product safety." (*Jimenez, supra*, 29 Cal.4th at p. 479.)  Amazon can, and indeed already does, "adjust the costs of liability in the course of [its] continuing business relationship with other participants in the overall manufacture and marketing enterprise." (*Ibid*.)  For each of these policies, Amazon functions in much the same manner as a conventional retailer.  Because the " 'overriding policy considerations' " are similar for each (*id*. at p. 480), Amazon should be held strictly liable.  We will discuss each policy in turn.

First, Amazon, like conventional retailers, may be the only member of the distribution chain reasonably available to an injured plaintiff who purchases a product on its website.  (*Vandermark, supra*, 61 Cal.2d at p. 262.)  The Amazon website, and especially the FBA program, enables manufacturers and sellers who have little presence in the United States to sell products to customers here.  In fact, the Amazon-designed features described above facilitate such a limited presence.  The dilemma for an injured plaintiff is illustrated by this litigation, where two defendants have been served and failed to appear, and a third defendant can only be served in China.  Other plaintiffs have encountered similar obstacles.  (See, e.g., *Fox v. Amazon.com, Inc.* (6th Cir. 2019) 930 F.3d 415, 424 (*Fox*).)  Because imposing strict liability on Amazon would help compensate some injured plaintiffs who would otherwise go uncompensated, Amazon's inclusion within the rule

would promote its purposes. "By extending liability to entities farther down the commercial stream than the manufacturer, the policy of compensating the injured plaintiff is preserved, and retailers and distributors remain free to seek indemnity against the manufacturer of the defective product." (*Kaminski v. Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 456 (*Kaminski*).)

Second, Amazon, again like conventional retailers, "may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety." (*Vandermark*, *supra*, 61 Cal.2d at p. 262.) Amazon's current efforts in this area show it has the capacity to exert its influence on third-party sellers to enhance product safety. It has "a robust and active process" to monitor, track, and log consumer complaints. It analyzes these complaints and determines whether to continue allowing a product to be offered for sale on Amazon. Amazon requires third-party sellers, as a contractual matter, to comply with all applicable laws and regulations. It has the power to demand proof of such compliance, or of additional certifications, before a third-party seller may offer products for sale. For example, Amazon recently imposed a requirement for Underwriters Laboratory certification for third-party sellers that intend to offer replacement batteries. If Amazon is unsatisfied with a third-party seller's response, or if its products turn out to be defective, Amazon has the power to suspend sales of certain products or block a third-party seller from offering products for sale—as it did with Lenoge. Just like a conventional retailer, Amazon can use its power as a gatekeeper between an upstream supplier and the consumer to exert pressure on those upstream suppliers (here, third-party sellers) to enhance safety. It therefore serves the purposes of the

doctrine to impose strict liability on Amazon, by adding an extra incentive for Amazon to do so.

Relatedly, the record shows that products sold on Amazon enjoy an "implied representation of safety," which also supports the imposition of strict liability under the circumstances here. (*Peterson*, *supra*, 10 Cal.4th at p. 1202.)  As Amazon's person-most-knowledgeable claimed at his deposition, "Amazon does everything in its power and goes above and beyond to make sure that we're providing the best customer experience, including safe products.  And, you know, I want that for all of our customers and for myself when I buy from Amazon, so I hope people believe that."  Because Amazon customers have an expectation of safety—and Amazon specifically encourages that expectation—it is appropriate to hold Amazon strictly liable when a defective product is sold through its website.

Third, Amazon, like conventional retailers, has the capacity to adjust the cost of compensating injured plaintiffs between itself and the third-party sellers in the course of their ongoing relationship.  (*Vandermark*, *supra*, 61 Cal.2d at p. 263.)  Amazon already imposes continuing contractual duties on third-party sellers, including the requirement that third-party sellers broadly indemnify Amazon.  Amazon requires third-party sellers to provide credit card and bank account information to ensure those duties are enforced. Additionally, Amazon can delay or withhold payments to a third-party seller if it determines the seller's actions or performance "may result in customer disputes, chargebacks or other claims" related to its Amazon sales.  If a third-party seller's revenues exceed a certain threshold, the third-party seller must also obtain general commercial liability insurance, listing Amazon as an additional named insured.  These provisions already distribute costs between Amazon and the third-party sellers.  We note these provisions are merely

illustrative of Amazon's *ability* to adjust the costs of liability between itself and third-party sellers; the imposition of strict liability does not depend on the current existence of any of these provisions.  Because Amazon has the ability to adjust the cost of compensating injured plaintiffs between itself and third-party sellers, imposing strict liability on Amazon along with other members of the chain of distribution serves the purposes of the doctrine. (See, e.g., *State Farm Fire & Casualty Co. v. Amazon.com, Inc.* (W.D.Wis. 2019) 390 F.Supp.3d 964, 972 (*State Farm*) ["The undisputed facts show that Amazon is an integral part of the chain of distribution, an entity well-positioned to allocate the risks of defective products to the participants in the chain."].)

In its contrary arguments, Amazon focuses on dictionary definitions of "seller" and "distributor" and claims it cannot be held strictly liable because those definitions do not apply to it.  It characterizes its business as a service, i.e., a forum for others to sell their products, and therefore outside the rule of strict liability.  It also contends the policy considerations behind the rule do not support its application here.  Amazon's arguments are unpersuasive.

Dictionary definitions of seller and distributor do not define the scope of strict liability in California.  Nor does Commercial Code section 2106, defining a "sale" for purposes of the law of sales.  Amazon has not cited any California precedent applying such definitions to determine the scope of strict liability.  Out-of-state authorities relying on such definitions (see, e.g., *Erie Insurance Co. v. Amazon.com, Inc.* (4th Cir. 2019) 925 F.3d 135, 141 (*Erie*)) or

the sales requirement of title transfer (see, e.g., *Eberhart v. Amazon.com, Inc.* (S.D.N.Y. 2018) 325 F.Supp.3d 393, 398) are inapplicable.[6]

The doctrine of strict liability in California was intended to cut through such technicalities and compensate plaintiffs for injuries caused by defective products.  (See *Price*, *supra*, 2 Cal.3d at p. 251; *Daly*, *supra*, 20 Cal.3d at p. 733; see also *Kaminski*, *supra*, 175 Cal.App.3d at p. 457 [" 'The constant theme of strict tort liability has been "to elevate justice and equity above the exact contours of a mathematical equation. . . ." ' "].)  The doctrine applies to every entity involved in the vertical distribution of consumer goods, so long as the policies of the doctrine support its application.  (*Arriaga*, *supra*, 167 Cal.App.4th at pp. 1534-1535; *Bay Summit*, *supra*, 51 Cal.App.4th at p. 773.)  Where an entity is "an integral part of the overall producing and marketing enterprise" for a consumer product, it should bear the cost of injuries resulting from product defects.  (*Vandermark*, *supra*, 61 Cal.2d at p. 262; accord, *Jimenez*, *supra*, 29 Cal.4th at p. 479.)

In a similar vein, Amazon argues that sellers have control over a product, and "control is the touchstone for product liability."  To support this

---

[6]   The issue of Amazon's strict liability for third-party sales has been, and continues to be, litigated in state and federal courts across the country.  The parties have cited numerous published and unpublished authorities from other jurisdictions.  Some hold Amazon strictly liable (see, e.g., *State Farm*, *supra*, 390 F.Supp.3d at p. 973), while others do not (see, e.g., *Erie*, *supra*, 925 F.3d at p. 144).  Ultimately these authorities are of limited utility.  Many are arguably factually distinguishable, including because the product at issue was not sold through Amazon's FBA program.  Many are arguably legally distinguishable, including because other state statutes or case law have limited strict liability in a manner inconsistent with California law.  We have reviewed the authorities cited by the parties and have, to a limited extent, included citations where helpful in this opinion.  Further discussion of each authority cited by the parties would not add to our analysis or be useful for the reader.

proposition, Amazon quotes *O'Neil*, *supra*, 53 Cal.4th at page 349: "It is
fundamental that the imposition of liability requires a showing that the
plaintiff's injuries were caused by an act of the defendant or an
instrumentality under the defendant's control." *O'Neil* has no application
here, since it involved an attempt to hold a manufacturer responsible for
defects in *another* manufacturer's product. (*Ibid.*)  Unlike Amazon, the
defendant in *O'Neil* had no involvement with the other manufacturer's
product and was not part of the product's chain of distribution. (*Id.* at
pp. 349-350.)  But accepting the quoted statement at face value, it does not
support Amazon's position.  Amazon had control over both the product at
issue and the transaction that resulted in its sale to Bolger.  It constructed
the Amazon website, accepted Lenoge as a third-party seller, marketed
Lenoge's offer for sale, took possession of the replacement battery, accepted
Bolger's order for the battery, billed her for the purchase price, and shipped
her the battery in Amazon-branded packaging.  But for Amazon's own acts,
Bolger would not have been injured.  Amazon's own acts, and its control over
the product in question, form the basis for its liability.[7]

     Amazon relies heavily on the suggestion that it did not *choose* to offer
the Lenoge replacement battery for sale.  It is true that an Amazon employee
does not appear to have selected the Lenoge replacement battery for sale, to
the exclusion of other competing replacement batteries.  But that fact is not

---

[7]    As one commentator has explained, "All those involved in the
distribution chain play a part in stimulating consumer demand for the
product through advertising and marketing techniques in order to enhance
their own profits.  By so doing, they necessarily increase the number of
persons exposed to risk of injury from the product.  Having increased the
risk, they should bear the burden of resulting injuries."  (Zerne et al., Cal.
Practice Guide:  Personal Injury (The Rutter Group 2019) ¶ 2:1178.)

determinative here for two reasons.  First, regardless whether Amazon selected this particular battery for sale, it chose to host Lenoge's product listing, accept Lenoge into the FBA program, take possession of the battery, accept Bolger's order, take her payment, and ship the battery to her.  Amazon is therefore part of the chain of distribution even if it did not consciously select the Lenoge replacement battery for sale.  Second, and more fundamentally, Amazon *did* choose to offer the Lenoge replacement battery for sale.  Amazon is no mere bystander to the vast digital and physical apparatus it designed and controls.  It chose to set up its website in a certain way, it chose certain terms and conditions for third-party sellers and their products, it chose to create the FBA program, it chose to market third-party sellers' products in a certain manner, it chose to regulate third-party sellers' contact with its customers, it chose to extend certain benefits to its customers and members who purchase third-party sellers' products, and most importantly it chose to allow the sale at issue here to occur in the manner described above.  Amazon made these decisions consciously, and if it had made different decisions, the mix of products offered and sold on its website would have been different.  The Lenoge replacement battery might not even have been offered for sale—as indeed it currently is not because of safety concerns.  Nothing aside from Amazon's own choices required it to allow Lenoge to offer its product for sale, to store Lenoge's product at its warehouse, to accept Bolger's order, or to ship the product to her.  It made these choices for its own commercial purposes.  It should share in the consequences.

Amazon analogizes its role to an auctioneer or finance lessor, which California courts have found not strictly liable for product sales that they merely facilitate.  This analogy is inapt.

The auctioneer precedents apparently involve the sale of *used* goods, which for obvious reasons are distinguishable.  (*Brejcha v. Wilson Machinery Inc.* (1984) 160 Cal.App.3d 630, 635-636; *Tauber-Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268, 274; see *Peterson*, *supra*, 10 Cal.4th at pp. 1201-1202.)  One opinion suggested in dicta that an auctioneer who was the exclusive sales agent for *new* consumer goods would be strictly liable.  (*Tauber-Arons*, at p. 276.)  In any event, the role of the auctioneers in these opinions was much more limited than Amazon's role.  The auctioneers played no more than a "random and accidental role" in transferring the goods from the seller to the buyer.  (*Brejcha*, at p. 641; *Tauber-Arons*, at p. 284.)  They had no continuing relationship with anyone in the original chain of distribution to the consumer and therefore could not exert any influence on product safety.  (*Tauber-Arons*, at p. 283.)  Here, Amazon was part of the original chain of distribution, and its role was anything but random and accidental.  The auctioneer precedents are inapposite.

Finance lessors were at issue in *Arriaga*, *supra*, 167 Cal.App.4th 1527.  The court summarized their commercial role as follows:  "To a substantial extent, the role of a finance lessor may be analogized to the role of a bank that loans money to its clients.  [Citation.]  However, rather than simply loaning the money for the purchase to the ultimate user of the equipment, the transaction is set up as a 'lease,' with the lessor 'purchasing' the equipment for the specific purpose of 'renting' it to the user.  [Citation.]  Accordingly, the finance lease can be thought of as a 'disguised' security agreement, a secured installment sales contract, or a lease ' " 'intended as security.' " '  [Citation.]  Normally, the lessor is unfamiliar with the particular equipment involved.  [Citation.]  Further, although this security agreement is

33

written in lease form, the finance lessor does not expect to retake the equipment at the end of the lease period.  [Citation.]  Therefore, the parties generally execute a contemporaneous option whereby the user can purchase title to the equipment from the lessor at the end of the lease period for an amount less than the then expected value of the equipment."  (*Id.* at p. 1536.)

*Arriaga* accepted that finance lessors may be a link in the vertical chain of distribution.  (*Arriaga*, *supra*, 167 Cal.App.4th at p. 1538.)  But, as noted above, "strict liability is not imposed even if the defendant is technically a 'link in the chain' in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied.  Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants."  (*Id.* at p. 1537.)

*Arriaga* found that a critical policy consideration behind the doctrine of strict liability, enhancing product safety, would not be satisfied by imposing liability on finance lessors.  (*Arriaga*, *supra*, 167 Cal.App.4th at p. 1538.)  "A finance lessor . . . does not select the specific machine or manufacturer of the machine.  Accordingly, unlike a retailer or a commercial lessor, the finance lessor does not maintain an ongoing relationship with a particular manufacturer.  Thus, the finance lessor is not in any position to either directly or indirectly exert pressure on the manufacturer to enhance the safety of the product."  (*Ibid*.)  Here, unlike a finance lessor, Amazon does have a continuing relationship with its third-party sellers.  Lenoge was an Amazon seller for four years before the sale at issue here.  Amazon can and

does exert pressure on those sellers to enhance the safety of their products. *Arriaga* is therefore inapplicable.[8]

Amazon also cites the Restatement Third of Torts, Products Liability, section 20, comment g, which states, "Persons assisting or providing services to product distributors, while indirectly facilitating the commercial distribution of products, are not subject to liability under the rules of this Restatement.  Thus, commercial firms engaged in advertising products are outside the rules of this Restatement, as are firms engaged exclusively in the financing of product sale or lease transactions.  Sales personnel and commercial auctioneers are also outside the rules of this Restatement."

Amazon does not explain how it fits within this exclusion, nor does it attempt to assess whether the exclusion is consistent with California law. Our Supreme Court, which originated the doctrine of strict products liability, has not hesitated to disagree with the Restatement where it has unduly limited the doctrine.  (See, e.g., *Cronin*, *supra*, 8 Cal.3d at pp. 131, 135; *Price*, *supra*, 2 Cal.3d at p. 253.)  Amazon's bare citation does not call into question the analysis we have undertaken above.  In any event, Amazon's activities go far beyond "indirectly facilitating the commercial distribution of products," as described in the Restatement.

Regarding the policies to be served by the doctrine, Amazon first claims that the Legislature, not this court, is the appropriate forum to address

---

[8]     Amazon also compares itself variously to a shopping mall landlord, a credit card issuer, a trucking company, an Internet search provider, or a newspaper running classified advertisements.  Amazon claims that holding it strictly liable would lead to strict liability for these entities as well.  Amazon does not support this claim with any legal argument, and the obvious differences between Amazon and those entities do not need to be elucidated here.

whether those policies would be served in new contexts.  Amazon does not cite any California authority for this claim, which is unsurprising because it runs directly contrary to California law.  Strict liability is a common law doctrine in California.  It was created by the courts, which have expanded and contracted the doctrine where warranted by its purposes.  (*Daly*, *supra*, 20 Cal.3d at p. 733; *Acqua Vista Homeowners Assn. v. MWI, Inc.* (2017) 7 Cal.App.5th 1129, 1143.)  Amazon implies that e-commerce is somehow different.  But the fact that the Legislature has enacted laws regulating e-commerce in other ways (see, e.g., Rev. & Tax. Code, § 6042 [sales tax collection]; Civ. Code, § 1798.91.04 et seq. [data security and software downloads])—just as it regulates conventional commerce—does not mean courts should defer to the Legislature on strict liability, which has not been subject to regulation in the context of e-commerce or otherwise.[9]

Amazon next contends that "expanding strict liability to websites for products sold by others would not serve, and may even frustrate," the policies underlying the doctrine of strict liability.  We note first that the issue in this appeal is not whether "websites for products sold by others" should generally be held strictly liable.  It is whether Amazon may be held strictly liable for the defective Lenoge replacement battery at issue here.  Other factual situations involving "websites for products sold by others," including other

---

[9]     Amazon claims the Legislature would be best positioned to assess allegedly countervailing policies including "consumer interest in a broad selection of products and the fairness of imposing a tax on e-commerce, including millions of upstanding sellers and small businesses, to insure against isolated personal injuries."  Concerns over costs and the availability of goods are not unique to e-commerce, however.  California courts have examined the applicability of strict liability in numerous diverse contexts, including those discussed above.  Amazon has provided no reason why the courts cannot examine the doctrine in this context as well.

sales through Amazon, may be distinguishable.  We express no opinion regarding whether strict liability should or should not apply in such situations.

Regarding product safety, Amazon primarily asserts that it does not have relationships with manufacturers of third-party products, so it cannot "directly" pressure the manufacturer.  The assertion is unaccompanied by any record citation, so we may disregard it.  But even assuming that it is true in some cases, Amazon is incorrect that a direct relationship with a *manufacturer* is necessary to promote product safety.  (See *Kaminski*, *supra*, 175 Cal.App.3d at pp. 456-457.)  A conventional retailer, for example, is not shielded from liability merely because it has an ongoing relationship with a product's distributor rather than its manufacturer.  Amazon, like a conventional retailer, can exert pressure on manufacturers indirectly through the parties with whom it does have ongoing relationships, i.e., third party sellers.  (See *Fox*, *supra*, 930 F.3d at pp. 424-425; *Gartner v. Amazon.com, Inc.* (S.D.Tex. 2020) 433 F.Supp.3d 1034, 1044; cf. *Arriaga*, *supra*, 167 Cal.App.4th at p. 1538 ["[T]he finance lessor is not in any position to either directly or indirectly exert pressure on the manufacturer to enhance the safety of the product."].)[10]

---

[10]    In its response to an amicus curiae brief, Amazon goes further.  It claims that *existing* products liability law has had no effect on consumer safety.  It argues that the policy considerations underlying then-Justice Traynor's seminal concurring opinion in *Escola v. Coca Cola Bottling Co. of Fresno* (1944) 24 Cal.2d 453, which was later adopted by the Supreme Court in *Greenman*, *supra*, 59 Cal.2d at page 63, no longer apply to many modern retail transactions, including those on Amazon.  Needless to say, as an intermediate appellate court, we cannot entertain the wholesale dismantling of California's strict products liability doctrine, even if we were inclined to do so (and we are not).

Regarding compensation, Amazon notes that expanding strict liability to new defendants (thereby spreading losses more broadly throughout society) is insufficient in itself to justify such expansion. (See *Peterson*, *supra*, 10 Cal.4th at p. 1207.) But, as discussed above, strict liability for Amazon under the circumstances here would promote each of the policies underlying the doctrine. It is not solely predicated on Amazon's availability as a defendant.

Regarding cost allocation, Amazon claims that strict liability would force it to be an insurer for consumers of third-party products. Amazon is incorrect. Strict liability is not absolute liability. (*Daly*, *supra*, 20 Cal.3d at p. 733.) "On the contrary, the plaintiff's injury must have been caused by a 'defect' in the product." (*Ibid*.) Amazon also claims that strict liability would operate as a tax on "millions of faultless third-party sellers who have never sold a defective or dangerous product" and lead to higher prices for products sold on Amazon. This claim is somewhat tangential to the primary policy at issue. The primary policy of cost allocation is promoted where participants in the chain of distribution can adjust costs between themselves, i.e., for the products they handle in common. (See *O'Neil*, *supra*, 53 Cal.4th at p. 363; *Vandermark*, *supra*, 61 Cal.2d at p. 263.) *Peterson*, on which Amazon relies, held that this policy was not met in the case of residential landlords because "[a] landlord or hotel owner, unlike a retailer, often cannot exert pressure upon the manufacturer to make the product safe and cannot share with the manufacturer the costs of insuring the safety of the tenant, because a landlord or hotel owner generally has no 'continuing business relationship' with the manufacturer of the defective product." (*Peterson*, *supra*, 10 Cal.4th at p. 1199.) In that circumstance, " '[t]he cost of insuring risk will not be distributed along the chain of commerce but will probably be absorbed by

tenants who will pay increased rents.' " (*Ibid*.)  Here, by contrast, Amazon has a continuing business relationship with the upstream supplier (third-party seller) and the consumer will not necessarily absorb any increased costs.

There is, of course, a risk that the upstream supplier and other entities in the chain of distribution will be insolvent or unavailable.  But that circumstance is precisely why the doctrine of strict liability has been expanded to include the entire chain of distribution, including retailers, where the policies of the doctrine are otherwise served.  (See *Vandermark*, *supra*, 61 Cal.2d at p. 262.)  The risk of nonpayment, in such a circumstance, should fall on an entity that benefited from the sale of the product rather than the injured plaintiff.  (*Id*. at pp. 262-263; *Greenman*, *supra*, 59 Cal.2d at p. 63.)  Amazon can choose how to absorb that risk.  Nothing in the record supports its assertions that it would be forced to indiscriminately raise its fees on "millions of faultless third-party sellers who have never sold a defective or dangerous product," or that the burden of such a hypothetical fee

increase would ultimately fall on Amazon customers rather than be absorbed by sellers themselves in form of reduced profits.[11]

Both parties in this appeal recognize that the application of the doctrine of strict liability to Amazon under the circumstances here presents important issues that have not been fully addressed in prior precedents.  But the novelty of these issues does not prevent us from applying the doctrine where, as here, it is warranted.  "Law, as an instrument of justice, has infinite capacity for growth to meet changing needs and mores.  Nowhere is this better illustrated than in the recent developments in the field of products liability.  The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times.  Ancient distinctions that make no sense in today's society and that tend to discredit the law should be readily rejected as they were step by step in *Greenman* and *Vandermark*."  (*Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227.)

---

[11]     In somewhat contradictory fashion, Amazon argues that it does not set the price for third-party products and therefore cannot "spread the cost of defects across units sold."  But as Amazon itself notes, it does control its fees.  If it desires, it can increase fees on high-risk products, or all products, and thereby spread the cost of compensating consumers injured by such products.  That is not inconsistent with the purposes of strict liability, and it is not predicated on Amazon's particular financial strength or bargaining position. " 'The rationale of [*Greenman*] does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action.  It rests, rather, on the proposition that "The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." ' "  (*Price*, *supra*, 2 Cal.3d at p. 251, fn. 5; see *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1153.)  Amazon also controls access to its website.  As outlined above, if it desires, it can limit the sale of products that create a commercially unreasonable risk of injury.

The record does not demonstrate as a matter of law that Amazon cannot be held strictly liable for defects in third-party products sold through its website, at least under the circumstances here.  The trial court therefore erred by summarily adjudicating Bolger's causes of action for strict products liability on this basis.  (See *Jimenez*, *supra*, 29 Cal.4th at p. 485.)[12]

### III

### *Immunity Under Section 230*

Amazon contends that, regardless of its liability under California law, it is shielded by the federal CDA, specifically title 47 United States Code section 230 (section 230).  In relevant part, that section provides, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  (47 U.S.C. § 230, subd. (c)(1).)  "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  (*Id.*, subd. (e)(3).)

---

12    In her briefing, Bolger also contends the court erred by summarily adjudicating her "negligence" cause of action.  But, as Amazon points out, Bolger limited her opposition in the trial court to her strict products liability claims.  Bolger responds that she only abandoned her negligent undertaking claim, but not other "negligence-based theories."  Her opposition in the trial court did not address any such negligence-based theories, and she provides no persuasive reason why we should consider her arguments for the first time on appeal.  We decline to do so.  (See *NBCUniversal Media LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1236-1237; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)  Bolger also does not substantively address her causes of action for negligent products liability, breach of express warranty, or breach of implied warranty.  Thus, Bolger has not met her burden of showing the court erred by summarily adjudicating those claims.  (See *Frittelli*, *supra*, 202 Cal.App.4th at p. 41; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

"Taken together, these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties.  [Citation.]  Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.  [Citation.]  State-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online."  (*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.* (4th Cir. 2009) 591 F.3d 250, 254.)

"[T]he reason for excluding interactive computer services from liability for republication was 'to promote the continued development of the Internet and other interactive computer services . . . [and] to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.'  [Citations.]  To that end, CDA immunity is to be construed broadly, 'to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.' "  (*Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 206 (*Cross*).)

Immunity under section 230 extends to " '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.' "  (*HomeAway.com, Inc. v. City of Santa Monica* (9th Cir. 2019) 918 F.3d 676, 681 (*HomeAway.com*).)  The first element is not at issue here.  The dispositive question is whether Bolger's strict liability cause of action seeks to treat Amazon as a publisher or speaker of information provided by another.

"In evaluating whether a claim treats a provider as a publisher or speaker of user-generated content, 'what matters is not the name of the cause of action'; instead, 'what matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another.' [Citation.]  Put slightly differently, 'courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker."  If it does, section 230(c)(1) precludes liability.' " (*Cross*, *supra*, 14 Cal.App.5th at p. 207.)

Courts have declined to apply section 230 to strict products liability claims.  In *Erie*, the federal appellate court rejected Amazon's argument that section 230 shielded it from products liability claims:  "The products liability claims asserted by Erie in this case are not based on the publication of another's speech.  The underpinning of Erie's claims is its contention that Amazon was the *seller* of the headlamp and therefore was liable as the seller of a defective product.  There is no claim made based on the *content of speech published* by Amazon—such as a claim that Amazon had liability as the publisher of a misrepresentation of the product or of defamatory content.  [Citations.]  While the [CDA] protects interactive computer service providers from liability *as a publisher of speech*, it does not protect them from liability as the seller of a defective product." (*Erie*, *supra*, 925 F.3d at pp. 139-140.)  Similarly, in *State Farm*, the federal district court held, " 'In strict product liability actions, the "act" to which the seller's responsibility attaches is not an act of negligence.  If indeed it is an act at all, it is simply the act of placing or maintaining a defective product in the stream of commerce.' [Citation.]  Amazon's active participation in the sale, through payment processing, storage, shipping, and customer service, is what makes it strictly liable.  This

is not activity immunized by the CDA." (*State Farm*, *supra*, 390 F.Supp.3d at pp. 973-974.)

We agree with *Erie* and *State Farm* on this issue. Bolger's strict products liability claims target Amazon's role in "the vertical distribution of consumer goods" (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773) as an "integral part of the overall producing and marketing enterprise" for the Lenoge replacement laptop battery (*Vandermark*, *supra*, 61 Cal.2d at p. 262). It is based on Amazon's own conduct, as described above, not the content of Lenoge's product listing. Bolger's claims do not require a court to treat Amazon as the speaker or publisher of content provided by Lenoge. The content of the product listing is not determinative, and it need not be attributed to Amazon to support strict liability. Instead, Amazon's own involvement in the distribution of an allegedly defective product supports strict liability for the reasons we have already discussed.

Amazon relies on this court's opinion in *Gentry v. eBay Inc.* (2002) 99 Cal.App.4th 816 (*Gentry*), but it is distinguishable. In that case, plaintiffs sued the online shopping website eBay for its role in hosting third-party sales listings for allegedly counterfeit sports memorabilia. (*Id.* at pp. 821-822.) Plaintiffs alleged causes of action for (1) violation of Civil Code section 1739.7, subdivision (b), which requires a dealer who "provides [a] description[] of [a] collectible[] as being autographed" to furnish a certificate of authenticity at the time of sale; (2) negligence in allowing false and misleading sales listings or user reviews to be posted; and (3) derivative unfair competition claims. (*Gentry*, at pp. 822-823.)

*Gentry* held that section 230 applied to each cause of action. As to the Civil Code violation, this court explained, "The substance of [plaintiffs'] allegations reveal they ultimately seek to hold eBay responsible for conduct

44

falling within the reach of section 230, namely, eBay's dissemination of representations made by [others], or the posting of compilations of information generated by those defendants and other third parties." (*Gentry*, *supra*, 99 Cal.App.4th at p. 831.)  This court explained that eBay "merely made the individual defendant's false product descriptions available to other users on its Web site, or provided the Web site on which the individual defendants designated their collectibles as autographed," and holding eBay liable would put it "in the shoes of the individual defendants, making it responsible for their publications or statements." (*Id*. at pp. 832-833.) Similarly, section 230 shielded eBay against plaintiffs' negligence claims because they were based on "false and/or misleading content created by the individual defendants and other coconspirators" or not taking editorial action against the individual defendants' false and misleading content. (*Id*. at pp. 834-835.)

Here, by contrast, Bolger's strict products liability claims do not depend on the content of Lenoge's product listing, e.g., whether it was false or misleading.  Bolger's claims are based on Amazon's role in the chain of production and distribution of an allegedly defective product.  The fact that some content provided by Lenoge was posted on the Amazon website does not automatically immunize Amazon for its own choices and activities unrelated to that content. (See *HomeAway.com*, *supra*, 918 F.3d at pp. 682-683.)

The other authorities cited by Amazon are similarly distinguishable because they depend on the content of third-party postings. (See *Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 573 [claims based on a website's decision "to restrict or make available certain material"]; *Jane Doe No. 1 v. Backpage.com, LLC* (1st Cir. 2016) 817 F.3d 12, 21 [claims based on "choices about what content can appear on the website and in what form"]; *Chicago*

*Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*
(7th Cir. 2008) 519 F.3d 666, 671 [claims based on content of allegedly
discriminatory housing advertisements]; *Green v. America Online* (*AOL*)
(3d Cir. 2003) 318 F.3d 465, 471 [claim that "AOL was negligent in
promulgating harmful content and in failing to address certain harmful
content on its network"]; *Daniel v. Armslist, LLC* (Wis. 2019) 926 N.W.2d
710, 726 [claim that defendant "provided an online forum for third-party
content and failed to adequately monitor that content"].)  The content of
Lenoge's product listing is not determinative here.  Section 230 does not
shield Amazon from liability.

DISPOSITION

The judgment is reversed.  The trial court is directed to (1) vacate its
order granting summary judgment, (2) enter a new order denying summary
adjudication of Bolger's strict products liability claims and granting summary
adjudication of Bolger's remaining claims, and (3) conduct further

46

proceedings not inconsistent with this opinion.  Bolger shall recover her costs on appeal.

GUERRERO, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

47

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2020, I electronically filed the

foregoing **ATARI INTERACTIVE, INC.'S STATEMENT OF RECENT DECISION** with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

**SERVICE LIST**

*Atari Interactive, Inc. v. Redbubble Inc.*
U.S.D.C. N.D. CA, Oakland Division Case No. 4:18-CV-03451-JST
[Related to Case Nos. 3:18-cv-03843-JST; 3:18-cv-04115; 4:18-cv-04949-JST;
and 19-cv-00264-JST]


Kenneth B. Wilson                          Attorneys for Defendant
COASTSIDE LEGAL                            Redbubble, Inc.
455 1st Avenue
Half Moon Bay, CA 94019
Tel:     (650)440-4211
Fax:     (650)440-4851
ken@coastsidelegal.com
NO HARD COPIES – PAPERLESS OFFICE

Jonathan M. Masur                          Attorneys for Defendant
Zachary S. Davidson                        Redbubble, Inc.
ZUBER LAWLER &
  DEL DUCA LLP
2000 Broadway Street, Suite 154
Redwood City, California 94063
Telephone: (650) 434-8538
Email: jmasur@zuberlawler.com
          zdavidson@zuberlawler.com

Debora Sanfelippo
dsanfelippo@zuberlawler.com


_____

Andrea A. Augustine