United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ATARI INTERACTIVE, INC., | Case No. 18-cv-03451-JST |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT; ORDER SETTING CASE MANAGEMENT CONFERENCE** |
| v. | |
| REDBUBBLE, INC., | |
| Defendant. | Re: ECF Nos. 73, 75 |

Before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 73, 75. The Court will grant the motions in part and deny them in part.

## I.      BACKGROUND

### A.      The Parties

Plaintiff Atari Interactive, Inc. ("Atari") is an early video game company.  ECF No. 64-69 ¶ 15.  "The Atari brand is one of the most iconic brands in video game history and has been and remains well-known throughout the public at large."  *Id.* ¶ 16.  Beginning in the 1970s, Atari created a series of popular arcade video games, including Pong, Asteroids, and Breakout.  *Id.* ¶ 23. These games continue to have "retro" appeal to users, who build fan sites, play the Flash versions of these games, and follow Atari on Twitter.  ECF No. 64-71 ¶ 27.  Atari capitalizes on this good will by licensing official merchandise, including apparel, toys, games, drinkware, stickers, decals, and replica arcade cabinets.  *Id.* ¶ 29.  Atari has also released a "greatest hits" collection for Nintendo DS that packages its early games.  ECF No. 64-6 ¶ 8.

Defendant Redbubble, Inc. provides a "global online marketplace[] where independent artists upload their designs and creative works for sale on a range of products."  ECF No. 80-1. The products on which the artists' designs are printed include apparel, stationery, housewares,

1    bags, stickers, and wall art.  ECF No. 64-28.  In promotional materials, Redbubble explains its

2    business model as "personalized on-demand retail."  ECF No. 68 (Exhibit B).  In traditional retail,

3    customers buy from batch-manufactured goods that are stockpiled with the retailer.  *Id*.  But in

4    personalized on-demand retail, the customer chooses and customizes the good before it is made.

5    *Id*.  Print-on-demand (a "first wave" of this model) relies on batch-manufactured goods that the

6    buyer customizes through design.  *Id*.  Redbubble purports to take this evolution a step further by

7    having the manufacturer hold only raw goods, so that the physical product can be customized

8    through its physical form as well as through the design placed upon it.  *Id*.

9        **B.      Redbubble's Marketplace**

10       Redbubble's online marketplace works as follows:  first, an artist uploads her art to

11   Redbubble and selects, from a list predetermined by Redbubble, the products on which the art may

12   be sold (*e.g*., t-shirts, mugs, etc.).  ECF No. 78 ¶¶ 4-5.  Redbubble assures the artist that "a lot of

13   effort goes into finding awesome [physical] products that will do justice to your work."  ECF No.

14   64-26 at 23.  Redbubble and the artist together set the retail price:  Redbubble sets a "base price"

15   that covers its fee and manufacturing costs, while the artist selects the "creator margin" she will

16   receive from the sale.  The retail price is the sum of these figures.  *Id*. at 24; ECF No. 64-52 at 8.

17   During the upload, the artist can choose to provide additional information for the listing, including

18   a title, description, and keywords.  ECF No. 78 ¶ 6.

19       A visitor to Redbubble's website can then project the uploaded art onto stock photos of

20   different physical products to show the final products available for purchase.  ECF No. 78 ¶ 9.

21   The product listings include a title[1] with the words "Designed by [artist]."  *See* ECF No. 64-79

22   ("Designed by KalebFishStore").  Below the photos is a list of "features" for the physical product

23   drafted by Redbubble, such as that it is "ethically sourced" and has a "Slim fit, but if that's not

24   your thing, order a size up."  *See id*.; ECF No. 64-58.[2]  The artist's description – if the artist has

25   ───────────────────

26   [1] The title combines the artist's name for the art with Redbubble's name for the physical product.
     *See, e.g.*, ECF Nos. 64-79 ("Centipede Mural Slim Fit T-Shirt"), 64-80 ("Centipede Slim Fit T-

27   Shirt").

28   [2] Redbubble refers to this as "generic information displayed . . . without any involvement or
     intervention by Redbubble."  ECF No. 80 ¶ 32.  The Court interprets Redbubble to mean that its

provided one – appears after additional photos under the artist's name.  *See* ECF No. 80-7 at 3.  A link to "View [Artist's] Store" appears below that.  *Id.*

When a customer purchases a product, Redbubble processes the payment and then shows a confirmation page stating, "We're on it!"  ECF No. 64-72 ¶¶ 2-5; ECF No. 64-77.  Redbubble's web site then informs the customer that the product will be "made and shipped" and provides an estimated delivery date.  *See* ECF No. 64-77.  The page encourages the customer to give "kudos to the artists" by telling them "what you love about their designs," but directs them to contact Redbubble for customer service and any shipping issues.  *See id.*



ECF No. 64-77.

Redbubble then forwards the order to a preselected third-party manufacturer (called a "fulfiller") who creates the final product based on the customer's specifications.  ECF No. 79 ¶ 2; ECF No. 64-26 at 43:22-44:6.  Redbubble chooses its fulfillers based on quality standards, proximity to the customer, and product type.  *See* ECF No. 68; ECF No. 78 ¶ 12.  None of the

United States District Court
Northern District of California

employees write the text and that the software matches it to the product listing based on the type of product selected (*e.g.*, a t-shirt as opposed to a mug).  The information shown in the exhibits is not generic – it is specific to the physical product sold.  *Compare* ECF No. 64-79 (slim-fit t-shirt) *with* ECF No. 64-82 (graphic t-shirt).

United States District Court
Northern District of California

1  artist, customer, and fulfiller interact with each other; all communicate exclusively with

2  Redbubble.  ECF No. 64-26 at 49:23-50:15.  However, Redbubble claims to lack express

3  agreements with its fulfillers.  *Id.* at 98:11-25.  "They are neither affiliates of Redbubble nor

4  staffed by Redbubble."  ECF No. 79 ¶ 4.

5       Once the fulfiller creates the goods, Redbubble provides it with the customer's shipping

6  instructions – "standard" or "express" – and the fulfiller sends the goods directly to the consumer

7  using one of the two companies with which Redbubble has shipping agreements.  ECF No. 64-26

8  at 44:10-45:22.  The customer then receives an email notification that the product has shipped,

9  which encourages the buyer to "meet the artist" and states that "[a] portion of your purchase goes

10  directly to this creative," but otherwise again directs them to contact Redbubble to check order

11  progress, return or exchange an item, or determine the delivery date.  ECF No. 64-74 at 4.

12       The final product arrives at the consumer in Redbubble packaging, with a Redbubble tag,

13  and with a return addressee of "An Artist on Redbubble."  ECF No. 64-76.  The tag states that the

14  product is "[c]reated just for you by an independent artist and carefully printed by happy people in

15  matching socks," but once again directs the customer to Redbubble's website to address any

16  issues.  *Id.* at 8; ECF No. 64-26 at 63:18-64:5.  If the goods are damaged along the way,

17  Redbubble takes responsibility to arrange a replacement.  ECF No. 80-3 at 6.  But Redbubble's

18  replacement policy applies only to physical goods – Redbubble takes no responsibility for the

19  "quality of the content (including but not limited to misspelled words, grammatical errors,

20  formatting, design or overall appearance).  *Id.*  Redbubble handles all returns and refunds; the

21  artist is not involved with the customer care.   ECF No. 64-26 at 56:2-6.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /




ECF No. 64-76

In short, and as shown in the chart below, Redbubble undertakes at least four of the five steps necessary to complete a sales transaction:  the artist uploads the art, but Redbubble manages the order, coordinates the creation of the goods, arranges for delivery, and handles all customer service issues, returns, and refunds.  ECF No. 64-26 at 24.

### C.    The Dispute

Some time before the filing of the complaint, Atari noticed that Redbubble carries its trademarked and copyrighted designs.  Atari located 114 Atari marks, 18 Pong marks, and 61 copyrighted designs in Redbubble's marketplace.  ECF No. 64-30.  Atari claims that this reflects a broader pattern of widespread infringement on Redbubble's website.  ECF No. 73 at 11:5-12:23.  Atari did not, however, notify Redbubble of these infringing products before filing the complaint.







United States District Court
Northern District of California

1    *See* ECF No. 80 ¶ 26.

2         Once the complaint was filed, Redbubble immediately removed the listings identified in

3    Atari's complaint.  ECF No. 80-5.  Redbubble also began to proactively police for Atari-related

4    designs.  ECF No. 80 ¶ 27.  Redbubble claims that this practice is consistent with its usual policy:

5    while Redbubble does not proactively identify infringing content, it removes infringing listings

6    upon receiving notice, and also works with content owners to proactively screen for their content.

7    *Id.* ¶¶ 7-11; ECF No. 64-54.  The parties dispute the success of these efforts, Atari's experts

8    having identified over 4,000 "repeat offenders," including some artists that were reported for

9    infringement six or more times before being suspended.  ECF No. 64-67 ¶¶ 35-36.

## II.    JURISDICTION

11        This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   LEGAL STANDARD

13        Summary judgment is proper when a "movant shows that there is no genuine dispute as to

14   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

15   A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a

16   verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the

17   case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for

18   summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's

19   favor and may not weigh evidence or make credibility determinations.  *Id.* at 255.

20        Where the party moving for summary judgment would bear the burden of proof at trial,

21   that party "has the initial burden of establishing the absence of a genuine issue of fact on each

22   issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

23   480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of

24   proof at trial, that party "must either produce evidence negating an essential element of the

25   nonmoving party's claim or defense or show that the nonmoving party does not have enough

26   evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire &*

27   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party satisfies

28   its initial burden of production, the nonmoving party must produce admissible evidence to show

United States District Court
Northern District of California

that a genuine issue of material fact exists.  *Id.* at 1102-03.  If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV.      EVIDENTIARY ISSUES

The Court addresses two threshold evidentiary issues.  First, Atari seeks judicial notice of foreign judgments by an Australian trial court that found Redbubble liable for direct trademark infringement.  ECF Nos. 64-1, 64-2, 64-3.  The existence of those judgments is properly subject to judicial notice.  *See Cerner Middle E. Ltd. v. iCapital, LLC*, 939 F.3d 1016, 1023 n.8 (9th Cir. 2019); *Tahaya Misr Invest., Inc. v. Helwan Cement S.A.E.*, No. 2:16-cv-01001-CAS(AFMx), 2016 WL 4072332, at *1 n.3 (C.D. Cal. July 27, 2016).  However, that does not mean that the Court assumes the truth of the statements made therein.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  The Court also bears in mind that the Australian courts were not applying American law, and that Atari has made no effort to elaborate the differences or harmonize the Australian judgments with American law.  Thus, the Court takes notice of the judgments but gives them little weight.

Similarly, the Court takes judicial notice of the oral argument in *Ohio State University v. Redbubble, Inc.*, No. 19-388, ECF No. 48 (6th Cir. Mar. 12, 2020), as a public record, but does not assume the truth of the facts stated therein.  ECF No. 64-2; *see United States v. Raygoze-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 n.2 (9th Cir. 2007).

Second, both parties seek to rely on various statements regarding Redbubble's status as a seller for purposes of taxation.  Atari seeks to introduce Redbubble's annual reports, which suggest that Redbubble considers itself a seller for purposes of the sales tax.  ECF No. 64-28 at 55.  Redbubble seeks to rely on its user agreement, which states that Redbubble does not collect or pay taxes on the artist's behalf because it is merely "facilitating the sale of [the artist's] product."  ECF No. 80-3 at 13.  While liability for infringement might depend in certain circumstances on whether Redbubble is a "seller," neither party has established that the definition of a seller for purposes of the sales tax corresponds to the definition relevant here.  *Cf. Hoffman v. Conell*, 73 Cal. App. 4th

7

1    1194 (1999) ("The federal tax laws are not intended to determine a party's property rights.").  The

2    Court accordingly denies Atari' request and disregards Redbubble's argument based on the user

3    agreement.  For similar reasons, the Court disregards statements regarding agency made for

4    purposes of accounting.  *E.g.,* ECF No. 64-28 at 52 ("The [Redbubble] Group is acting as the

5    artists' agent in arranging for the selling of the artists' goods to customers"); *see Frank Lyon Co.*

6    *v. United States*, 435 U.S. 561, 577 (1978) (accounting does not lend substance).

7    **V.    DISCUSSION**

8            The parties cross-move for summary judgment on Atari's trademark and copyright

9    infringement claims based on direct, contributory, and vicarious liability.  Redbubble additionally

10   moves for summary judgment on willful infringement and to preclude Atari from offering a

11   damages case.  The Court addresses each claim.

12           **A.    Direct Trademark Infringement**

13           Atari moves for summary judgment on trademark infringement of Atari and Pong marks

14   based on Redbubble sales of products shown in ECF No. 64-30.  The parties' dispute centers on

15   whether Redbubble "uses" these marks in commerce, or merely facilitates others' use.

16           **1.    Legal Background**

17           The Lanham Act, which codifies federal trademark law, provides in relevant part that:

18               Any person who shall, without the consent of the registrant . . . use in
             commerce any reproduction, counterfeit, copy, or colorable imitation
19               of a registered mark in connection with the sale, offering for sale,
             distribution, or advertising of any goods or services on or in
20               connection with which such use is likely to cause confusion, or to
             cause mistake, or to deceive . . . shall be liable in a civil action by the
21               registrant for the remedies hereinafter provided.

22   15 U.S.C. § 1114(1)(a).

23           To prevail on a claim of direct trademark infringement, plaintiff must prove "(1) that it has

24   a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely

25   to cause consumer confusion."  *Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d

26   1137, 1144 (9th Cir. 2011).  Counterfeiting, which is a species of direct trademark infringement,

27   requires the use of "a spurious mark which is identical with, or substantially indistinguishable

28   from, a registered mark."  15 U.S.C. § 1127.  The Lanham Act does not impose liability on all

United States District Court
Northern District of California

8

uses of a trademark – only those that are likely to cause commercial confusion.  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676-77 (9th Cir. 2005).

In "patent, trademark . . . and copyright infringement cases, any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct."  *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015).  Thus, courts have found liability for a retailer that inadvertently sold counterfeit goods, *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986); a print-on-demand business that made goods based on customer-uploaded designs, *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1029-30 (E.D. Wis. 2018); a licensor who licensed others' infringing use, *Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F. Supp. 3d 1007, 1021-22 (N.D. Cal. 2018); and a competitor that used trademarks as "keywords" to advertise its own products.  *Network Automation*, 638 F.3d at 1144-45.

However, the alleged infringer must directly use the trademarks; a party that merely facilitates or assists others' use cannot be liable for direct infringement.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1992).  Thus, a flea market or swap meet that provides space for trademark infringers to sell their goods is only indirectly liable.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264-65 (9th Cir. 1996).  Other service providers that aid the infringer may avoid liability altogether.  *See Hard Rock Cafe Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143, 1148-49 (7th Cir. 1992) (suggesting that a party that helps an infringer erect a flea market stand would not be liable); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984-85 (9th Cir. 1999) (finding that an internet domain name registrant is not liable for passively routing infringing domain names).[3]

---

[3] Redbubble cites *Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 103 (2d Cir. 2010), for the proposition that online marketplaces are not liable for direct infringement.  However, *Tiffany* does not so hold. On the contrary, the Second Circuit in that case expressly considered eBay's *own* use of Tiffany's marks on its website, but determined that it constituted "fair use" as describing Tiffany's products. *See id*. at 102; *see also Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 935-36 (9th Cir. 2015) (considering Amazon's practice of showing search results without suggesting that the online marketplace is immune from direct liability).

United States District Court
Northern District of California

### 2.     Use in Commerce

Atari contends that Redbubble "uses" its trademarks in commerce by selling, offering to sell, and advertising t-shirts that bear Atari's logos.  ECF No. 73 at 17:6-20:5.  Redbubble does not dispute that these actions (which are expressly listed in the Lanham Act) constitute "use" of the trademarks, but argues that the artists, and not Redbubble, are the ones performing them.  ECF No. 75 at 9-11.

### a.     Sales

A party is strictly liable for selling infringing goods even if it does not itself affix the mark. *See, e.g.*, *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074 (C.D. Cal. 2004) (sellers of cigarettes with infringing packaging liable regardless of whether they knew the goods were counterfeit).  Atari argues that Redbubble is liable for infringement as "the primary moving force behind the sales" that occur on its website and the party that "controls every aspect of the sales." ECF No. 73 at 18:6-17.  Redbubble disagrees, citing *Ohio State University v. Redbubble, Inc.*, 369 F. Supp. 3d 840 (S.D. Ohio 2019), which found that Redbubble was not a "seller."  ECF No. 75 at 8:18-10:15.

In *Ohio State*, the court analogized Redbubble to Amazon Marketplace, which courts have found to be a facilitator of sales between other parties, rather than a seller itself.  369 F. Supp. 3d at 844.  For example, in *Milo & Gabby LLC v. Amazon.com, Inc.*, the Federal Circuit found that Amazon was not a seller for purposes of copyright infringement because a "sale" requires transfer of legal title from the seller to the buyer, and Amazon never held title to the goods sold through its website and shipped through its warehouses.  693 F. App'x 879, 866 (Fed. Cir. 2017) (citing the Uniform Commercial Code).  Amazon also "did not control what information or pictures were put up the product-detail page" or "the price for which the product was sold."  *Id*.  Analogizing to Amazon, the *Ohio State* court found that "Redbubble essentially offers to 'independent artists' an online platform through which to sell their goods and access to Redbubble's relationships with manufacturers and shippers," without directly selling the goods.  369 F. Supp. 3d at 845-46.

The Court respectfully disagrees with these conclusions, as applied here, for three reasons. First, as a factual matter, the evidence before this Court does not show that the artists who upload

10

their designs to Redbubble own the goods being sold – which are physical products bearing the art – sufficient to make them "sellers" under *Milo & Gabby*.  Redbubble's user agreement states that artists "may offer *their art* for sale on a physical product" – but the artists may not be offering the physical product itself for sale.  ECF No. 80-3 at 11.

Atari submits additional evidence supporting the conclusion that Redbubble, not the artists, own and sell the physical products on Redbubble's website.  Redbubble selects the specifications for the physical products and controls that process enough to make representations about the product's fit and other attributes.  *See* ECF No. 80 ¶ 32; ECF No. 80-7 at 2.  Redbubble also takes responsibility for damaged goods and arranges replacements to be made and shipped to the customer.  ECF No. 80-3 at 6.  As part of that process, Redbubble handles excess inventory generated through returns, reprints, and other activities, and usually discards the items.  *Id.*; ECF No. 64-26 at 56:2-10, 65:15-21.  Although Redbubble's user agreement states that "title and risk of loss for the [purchased] items pass from the [artist] to the customer/purchaser without passing through [Redbubble]," ECF No. 80-3 at 12, there is no evidence that the artists exercise any indicia of ownership over the physical products.[4]

Second, as a legal matter, a "sale" is not limited to sales by the owner.  Rather, the law recognizes a sale by anyone who has authority to transfer title.  *See Area 55, Inc. v. Amazon.com, Inc.*, No. 11-CV-00145-H (NLS), 2012 WL 12517661, at *3-4 (S.D. Cal. May 3, 2012); *see also* U.C.C. § 2-403(1) ("A purchaser of goods acquires title which his transferor had *or had power to transfer*" (emphasis added)).  Thus, even assuming that the artists hold some title in the products, Redbubble may still sell those products if it had authority to do so as the artists' agent.  *See* ECF No. 80-3 at 11 (recognizing Redbubble as the artist's agent "in relation to the sales transaction between [the artist] and the customer"); *cf.* Restatement (Third) of Agency § 7.01 (an agent is

---

[4] Outside of trademark law, courts routinely look beyond legal conclusions in an agreement to determine ownership.  *See, e.g.*, *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1230 (Fed. Cir. 2019) (disregarding legal conclusion in contract to determine ownership for purposes of patent standing); *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1080 (9th Cir. 2015) (disregarding agreement title to determine copyright first sale); *Sollberger v. C.I.R.*, 691 F.3d 1119, 1123-24 (9th Cir. 2012) (considering eight factors to determine if the "burdens and benefits of ownership" were transferred for purposes of taxation).

United States District Court
Northern District of California

liable for tortious actions performed on behalf of another).

Here, because the products do not exist at the time of the order, the "sale" is not a sale at all under the Uniform Commercial Code, but rather a contract to sell. *See* U.C.C. § 2-105(2) ("A purported present sale of future goods or of any interest therein operates as a contract to sell."). Accordingly, the key question is whether Redbubble (rather than the artist) can be understood to have contracted with the buyer to deliver title of the goods and whether it had authority to do so, either by virtue of owning the goods or by having authority from the owner.  In this respect, Atari's evidence shows that the customer forms a contract with Redbubble, not the artist. Redbubble designs the order process to create the impression that it itself offers the goods for sale. For example, Redbubble's product listings state that the products are "designed by" the artist, not "sold by" the artist. *See* ECF No. 64-80.  Redbubble's software accepts the orders and forms a contract without any input from the artist.  ECF No. 80-3 at 8.  Redbubble has the authority to make sales on the artist's behalf.  ECF No. 80-3 at 11-12 (giving Redbubble license and instructions to facilitate sale).  Redbubble's order confirmations further reinforce Redbubble's responsibility ("We're on it!"), while describing the artist as a mere beneficiary that receives "kudos" and a portion of the proceeds. *See* ECF Nos. 64-75, 64-77.  And the products themselves arrive in Redbubble packaging with a Redbubble tag to reinforce that they are *Redbubble's* products.  ECF No. 64-76.

Third, the Court finds this case very similar to *SunFrog*, 311 F. Supp. 3d at 1000.  Like Redbubble, "SunFrog is in the business of marketing, printing, and selling apparel, including t-shirts, sweatshirts, hoodies, leggings, and other products such as mugs, on its website." *Id.* at 1013.  Like Redbubble, SunFrog's "website includes an online retail marketplace where consumers can purchase the products advertised thereon." *Id.*  Like Redbubble, "the key feature of the site, and the source of much of SunFrog's success, is that it also provides a 'user-friendly,' 'simple' online platform where: (a) 'artists' can upload designs or artwork to SunFrog's 'All SunFrog Art Online Database' . . . for application to products by the artists and by others." *Id.* And like Redbubble, "SunFrog itself creates no designs, graphics, or images for use on products, though when one user wishes to share his design with others, SunFrog is the intermediary and

makes that design available through its website." *Id.*  SunFrog was sued by H-D U.S.A., LLC, the owners of the Harley Davidson trademarks, for trademark infringement based on SunFrog's sales of apparel and other goods bearing the registered marks.  *Id.* at 1017.  The district court granted summary judgment in H-D U.S.A., LLC's favor.  *Id.* at 1041.

The similarities between this case and *SunFrog* are striking.  As in this case:

- "SunFrog itself creates no designs, graphics, or images for use on products[.]" *Id.* at 1013.

- "SunFrog's sellers create new products by selecting 'blank' products (*e.g.*, a t-shirt bearing no images, designs, or text) made available by SunFrog and then adding logos, images, or text to be printed on the products.  Using SunFrog's online software, artists generate mockups of the finished product bearing their images or designs." *Id.* at 1013.

- "SunFrog then advertises and offers these finished products on its website.  For example, sellers have opened accounts, selected a blank t-shirt, and added designs displaying one or more of the H–D Marks in just a few minutes." *Id.* at 1014.

- "When consumers purchase products on SunFrog's website, SunFrog handles the payment transaction and then prints and ships the products to the consumers.  SunFrog's printers are 'highly automated' and print on-demand when a user submits a design for printing." *Id.* at 1014.

- "Because all products are produced on-demand, SunFrog does not keep any inventory of finished products." *Id.* at 1015.

There are some distinctions between this case and *SunFrog*.  Unlike Redbubble, "[i]n addition to printing the products as designed, SunFrog affixes its own trademarks and logos onto the products themselves, the products' tags, or both." *Id.* at 1014.  Redbubble does not put its mark on the actual product (although it does affix a tag with its trademark).  Also, SunFrog's employees both operated the printers that placed the designs onto the physical product and shipped the finished products to customers.  *Id.* at 1029-30.  These distinctions are entitled to some weight, certainly.  But they do not compel the conclusion that Redbubble is not a seller as a matter of law.

Accordingly, Redbubble's motion for summary judgment must be denied.

13

United States District Court
Northern District of California

At the same time, "Redbubble does not fit neatly into the category of either an 'auction house' on the one hand, that will generally be free from liability for direct infringement, or a company that itself manufactures and ships products on the other, on which liability for direct infringement can be readily imposed." *Y.Y.G.M. SA v. Redbubble, Inc.*, No. 2:19-cv-04618-RGK(JPR), 2020 WL 3984528, at *3 (C.D. Cal. July 10, 2020). A reasonable jury could conclude that Redbubble is merely a "transactional intermediary" and not a seller. *GMA Accessories, Inc. v. BOP, LLC*, 765 F.Supp.2d 457, 464 (S.D.N.Y. 2011). Redbubble's description of itself as the host of a marketplace "where independent artists upload their designs and creative works for sale on a range of products" has some basis in fact. ECF No. 80-1 at 2. It states that its mission is to give "independent artists a meaningful new way to sell their creations." ECF No. 80-2 at 2. It has no role in the selection of the art that is placed on the physical product. In *GMA Accessories*, the district court denied summary judgment for the trademark holder on direct infringement against a showroom because the showroom was "merely a broker, rather than a direct seller." *Id.* The district court noted there was "no evidence that [Defendant] took title to the merchandise, maintained an inventory of merchandise, bore the risk of loss or other traditional indicia of status as seller." *Id.;* see also *Ohio State*, 369 F. Supp. 3d at 844 (citing *GMA Accessories*). Here, while there is something much more than "no evidence" that Redbubble acts as a seller, Atari has not established that Redbubble is a seller as a matter of law.[5]

Accordingly, the Court denies summary judgment to both Atari and Redbubble on Atari's direct copyright infringement claim insofar as Redbubble is an alleged seller.[6]

---

[5] Indeed, two district courts have ruled that Redbubble is affirmatively not a seller as a matter of law. *Y.Y.G.M.*, 2020 WL 3984528 at *4; *Ohio State*, 369 F. Supp. 3d at 845.

[6] Redbubble also defends against this claim on the grounds that Atari has not shown "volitional conduct" by Redbubble. The volitional conduct doctrine is taken from copyright law, not trademark law. It requires that a plaintiff claiming direct copyright infringement "show causation (also referred to as 'volitional conduct') by the defendant." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017). Volition in this context refers, not to an "act of willing or choosing," but to proximate causation. *Id.* "Stated differently, 'direct liability must be premised on conduct that can reasonably be described as the direct cause of the infringement.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (quoting *Perfect 10*, 847 F.3d at 666) (emphasis omitted). The Court is not aware of any case within the Ninth Circuit applying the

#### b.      Offers to Sell

An offer to sell requires "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  Restatement (Second) of Contracts § 24 (1984).  A party may be liable for offering to sell an infringing good even if that party does not – and cannot – enter into an actual sale.  *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997).  Thus, an online marketplace may be liable for offering to sell an infringing good if "a person shopping on [the website] would have reasonably believed that the [website provider], and not the third-party sellers, was the seller with title or possession of a product who could have entered into a contract to transfer title or possession." *Alibaba.com Hong Kong LTD v. P.S. Prods., Inc.*, No. C-10-04457 WHA, 2012 WL 1668896, at *3 (N.D. Cal. May 11, 2012) (applying traditional contract law in patent infringement dispute); *see also Milo & Gabby, LLC v. Amazon.com*, No. C13-1932RSM, 2015 WL 4394673, at *14 (W.D. Wash. July 16, 2015).

A visitor to Redbubble's website could conclude that either Redbubble or the artist was the offeror for the same reasons that they could conclude that either was the seller.  Accordingly, both parties' motions for summary judgment are denied as to this prong also.

#### c.      Advertisements

Advertising provides a separate basis for a finding of trademark infringement.  *See* 15 U.S.C. § 1114(1)(a).  That is because advertising goods or services using a mark is likely to result in initial interest confusion, as customers are drawn to a website or vendor by the trademark.  *See Nissan Motor Co. v. Nissan Comp. Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004).  This type of confusion creates liability even if "no actual sale is finally completed as a result of the confusion." *Id*. (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002)); *see also Brookfield Commn's, Inc. v. W. Coast Ent'mt Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999) (giving example of a company putting up a billboard for a competitor to divert traffic at an

---

volitional conduct doctrine to a trademark infringement claim, and courts "have consistently rejected the proposition that a . . . kinship exists between copyright law and trademark law" sufficient to import a doctrine from one area to the other.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984).  The Court declines to address the issue further.

1    intersection, even if customers quickly realize that they arrived at a different store).

2         Here, Redbubble advertises by creating a "continually-updating 'product feed'" of product

3    listings for various advertising platforms, including Google and Facebook.  ECF No. 80 ¶ 33; ECF

4    No. 64-28 at 48:18-49:17.  Redbubble does not select any particular listing to advertise, but rather

5    lets Google and other platforms select product listings based on user interest.  ECF No. 80 ¶¶ 34-

6    35.  For example, Google might select a Redbubble listing that matches the user's search query or

7    browsing history.  *See* ECF No. 80-8 at 2.  However, Redbubble disavows any responsibility to

8    advertise on the artists' behalf.  *See* ECF No. 75 at 11:14-16.  Thus, the artists cannot be liable for

9    advertising infringement because Redbubble undertakes to advertise on its own initiative without

10   their involvement.  Indeed, the exhibits show that Redbubble advertises primarily its own services

11   as a marketplace, and only peripherally the products.  *See* ECF No. 64-32.

12        Accordingly, Redbubble is the only party that can be said to advertise and is strictly liable

13   for any trademark infringement that occurs as the result.  Redbubble argues that it avoids liability

14   because it does not select the listing advertised or affix marks to the displays, but these arguments

15   are unpersuasive.  The party that selects listings (Google and other advertising platforms) does so

16   automatically based on parameters specified by Redbubble.  *See* ECF No. 80 ¶¶ 34-35.  Even if

17   Redbubble lacks knowledge of the particular image shown, it remains strictly liable for actions

18   done without scienter.  Nor is there an affixation requirement in the Lanham Act:  any party that

19   uses a trademark is liable even if it did not itself affix the mark to the display.  *See El Greco*, 806

20   F.2d at 396; *C&L Int'l Trading Inc. v. Am. Tibetan Health Inst., Inc.*, No. 13 Civ. 2638(LLS), 13

21   Civ. 2763(LLS), 2015 WL 1849863, at *5 (S.D.N.Y. Aug. 22, 2015).  Accordingly, there is no

22   material dispute that Redbubble uses its product listings to advertise.

23        Nevertheless, Atari has not shown that it has a "protectable interest" in the trademarks

24   advertised.  *Network Automation*, 638 F.3d at 1144.  Atari introduces trademark registrations for

25   only two of its marks – Atari and Pong.  ECF Nos. 64-7, 64-8.  By contrast, the marks shown to be

26   advertised by Redbubble involve entirely different designs.  *See* ECF Nos. 64-32, 64-64, 64-65.

27   Thus, Atari has only circumstantial evidence that Redbubble may have advertised the protected

28   marks when Google and other advertising platforms selected the image for display.  Because Atari

United States District Court
Northern District of California

16

introduces insufficient evidence of how those platforms select listings, it fails to show entitlement to summary judgment for trademark infringement based on advertising.

Accordingly, both parties' motions for summary judgment are denied as to the third prong.

## B.   Indirect Trademark Infringement

Atari argues that Redbubble is liable for vicarious and contributory infringement based on direct infringement by fulfillers and artists, respectively.  To the extent that those parties are direct infringers, Atari does not establish secondary liability.

### 1.   Vicarious Liability – Fulfillers

Vicarious liability occurs where "the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Visa Int'l Serv.*, 494 F.3d at 807.  Atari introduces circumstantial evidence that Redbubble controls the appearance and fit of the physical products, including that Redbubble performs quality control, makes detailed representations about the products, and instructs the fulfillers to use Redbubble packaging and tags.  *See, e.g.*, ECF Nos. 68 (Exhibit C), 64-80, 80.  But Atari introduces no direct evidence of the relationship between Redbubble and fulfillers.  For example, the order form sent to the fulfillers and the "terms and conditions" imposed on them – or at least one of them – is missing from the record.  *See* ECF No. 64-26 at 98:11-25.  The existence of bare statements by Redbubble employees referring to fulfillers as "partners" cannot backfill that failure.  *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1113 (N.D. Cal. 2008).  Atari thus fails to satisfy its burden of production.

On the other hand, Redbubble has not established that no reasonable jury could find it vicariously liable based on Atari's circumstantial evidence.  Courts have found vicarious infringement where a party exerts significant control over the infringing activity.  *See, e.g., Robinson v. Delicious Vinyl Records Inc.*, No. 13-cv-41111, 2013 WL 3983014, at *6 (C.D. Cal. Aug. 1, 2013) (finding likely liability where defendant "directly engages" concert promoters and exercises "complete control" over the content).  *But see Visa Int'l Serv.*, 494 F.3d at 803, 808 (no vicarious liability for payment processor that could not stop infringement).  Here, given the level

1    of control exercised over the physical product and Redbubble's role in selecting and directing the

2    fulfiller, a reasonable jury could find Redbubble liable for the fulfillers' actions.  *See Oper. Tech.,*

3    *Inc. v. Cyme Int'l T&D Inc.*, No. SACV 14-009999 JVS (DFMx), 2016 WL 6246806, at *4 (C.D.

4    Cal. Mar. 31, 2016) (finding triable issues of fact where defendants made the infringing party the

5    sole authorized sales representative, retained control over scope of the work, and insulating risk

6    from lack of a buyer).  Accordingly, neither party is entitled to summary judgment on the

7    vicarious infringement claim.[7]

                    **2.    Contributory Infringement – Artists**

9           A service provider contributorily infringes a trademark when it "continue[s] to supply its

10   services to one who it knew or had reason to know was engaging in trademark infringement" and

11   has "direct control and monitoring of the instrumentality used by a third party to infringe."  *Louis*

12   *Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942 (9th Cir. 2011) (quoting

13   *Inwood Labs.*, 456 U.S. at 855).  In *Tiffany*, 600 F.3d at 107, the Second Circuit found that

14   contributory infringement requires knowledge of "specific instances of actual infringement," not

15   merely "general knowledge."  However, other circuits have not expressly adopted this rule, and

16   the Ninth Circuit requires only "actual or constructive knowledge that the users of [defendants']

17   services were engaging in trademark infringement."  *Akanoc*, 658 F.3d at 943; *see Luxottica Grp.,*

18   *S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1314-15 (11th Cir. 2019) (reserving judgment on

19   whether *Tiffany* standard applies); *Rosetta Stone*, 676 F.3d at 164-65 (finding that *Tiffany* has

20   "limited application" on summary judgment); *1-800 Contacts*, 722 F.3d at 1252-54 (limiting

21   *Tiffany* to cases where party cannot prevent infringement without impinging legal conduct).

22          At least two circuits have found contributory infringement where a service provider failed

23   to take reasonable steps to stop infringement despite having general knowledge of infringement.

---

25   [7] In *Y.Y.G.M.*, 2020 WL 3984528, at *10, the court found Redbubble not vicariously liable, despite
     its exercise of control over the products, because Redbubble did not exercise control over the
26   design itself.  However, Atari introduces evidence that the fulfillers communicate exclusively with
     Redbubble about the orders, including about potentially counterfeit designs, which could
27   reasonably lead them to conclude that Redbubble ratifies the content.  ECF No. 81-2 at 70:17-25,
     74:1-22.  Since vicarious infringement arises from agency principles, the key question is whether
28   the fulfillers act under direction from Redbubble in attaching the marks.  *See 1-800 Contacts, Inc.*
     *v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013).

United States District Court
Northern District of California

See *1-800 Contacts*, 722 F.3d at 1252-54; *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 504-05 (6th Cir. 2013).  In *1-800 Contacts*, the Tenth Circuit found that a company could be contributorily liable for its affiliate's advertisement using a competitor's mark because it "could have stopped the use of ads using [the] mark' by simply . . . send[ing] an email blast to its affiliates forbidding such use," but failed to take "reasonable action to promptly halt the practice" upon obtaining general knowledge of infringement.  722 F.3d at 1254-55.  Similarly, in *Goodfellow*, the Sixth Circuit found a flea market operator contributorily liable for vendors' infringement because it "had actual knowledge that the infringing activity was occurring at his flea market," but "failed to deny access to offending vendors or take other reasonable measures to prevent use of flea market resources for unlawful purposes, and failed even to undertake a reasonable investigation."  717 F.3d at 504.  And the Eleventh Circuit adopted similar reasoning in concluding that actual or constructive knowledge could arise from "many sources, including steps [defendants] could have taken to investigate alleged infringement" after obtaining general knowledge of infringement.  *Luxottica*, 932 F.3d at 1314.  *But see Hard Rock Cafe*, 955 F.2d at 1149 (finding that "reason to know" does not encompass information arising from duty to investigate).

Accordingly, the balance of authorities suggests that contributory infringement could occur when a service provider fails to take reasonable steps to prevent infringement while having general knowledge that such infringement is taking place.  Here, Atari argues that Redbubble fails to take any action to prevent infringement until after it receives notice from a rights holder, even though it has reason to know that widespread trademark infringement is occurring on its website.  ECF No. 81 at 19 (describing "a policy to not search for infringements absent prior notice from the rights holder").  But Redbubble's evidence shows that it does significantly more than that.  Redbubble's Marketplace Integrity Team proactively screens for infringing content based on information it receives from content owners.[8]  ECF No. 80 ¶ 8.  The team searches Redbubble's site for

---

[8] Redbubble cites cases stating that the law does not impose an "affirmative duty to police the Internet in search of potentially infringing uses."  *See, e.g.*, *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 966 (C.D. Cal. 1997).  However, the *reason* such policing is not required is because such steps are not practicable on the Internet as a whole.  *See Lucottica*, 932 F.3d at 1314.  What is at issue here is Redbubble's website, not the entire Internet.

potentially infringing listings using a list of terms "that are related to protected words or images provided by a content owner, such as trademarks, copyright-protected images, name and likeness." *Id.* ¶ 10.  Where the content owner alleges infringement on Redbubble's site generally but refuses to cooperate by identifying specific products, Redbubble attempts to screen based on its own judgment.  *Id.* ¶ 11.  Given that use of trademarked content is difficult to detect without input from the trademark owners, Atari fails to show that Redbubble's process is unreasonable.[9]

Atari argues that Redbubble could do more, such as disabling search terms on its website based on trademarked names.  Redbubble convincingly responds that many of the excluded search results would actually constitute fair use.[10]  In particular, product designs may use Atari's name in a descriptive sense without creating likelihood of confusion.  *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:11 (5th Ed. 2020).  Alternatively, Atari's name may be used as a keyword for designs "inspired by" Atari or the general arcade game aesthetic without infringing trademarks.  Redbubble is not required to disable functionality capable of substantial non-infringing use merely because some parties may use it to infringe.  *1-800 Contacts*, 722 F.3d at 1253-54.

Atari also submits evidence that Redbubble knowingly allows repeat infringers to upload content to Redbubble's site.  Atari's expert testified that of the 4,356 sellers who were reported to Redbubble as having posted infringing content, 1,081 were repeat infringers who had more than one report submitted to Redbubble for an intellectual property violation.  ECF No. 64-67 ¶ 35.  Such sellers had to be reported to Redbubble between two and 34 times before their accounts were suspended.  *Id.* ¶ 36.  412 sellers were reported three or more times; 195 sellers were reported four

---

[9] For this reason, the evidence identified in Atari's surreply, which shows additional infringing products available after completion of summary judgment briefing, does not convince.  ECF No. 93.  As Redbubble shows in its response, these additional products lack identifiable information that would have enabled identification of the counterfeiting.  ECF No. 94 at 2:6-22.

[10] The Ninth Circuit has recognized both a "nominative fair use defense" and "a classic fair use defense."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010).  The classic fair use defense, which is the only one at issue here, "allows a party to use a descriptive word 'otherwise than as a mark . . . [and] fairly and in good faith only to describe the goods or services of such party, or their geographic origin.'" *Id.* at 1039 (quoting 15 U.S.C. § 1115(b)(4)).

United States District Court
Northern District of California

or more times; 125 sellers were reported five or more times; and 93 sellers were reported six or more times.  *Id.*  This evidence is significant because the Ninth Circuit focuses on knowledge that "users of [defendants'] services were engaging in trademark infringement," not on knowledge of particular acts of infringement.  *Akanoc*, 658 F.3d at 943; *accord Rosetta Stone*, 676 F.3d at 163-65 (vacating summary judgment of no contributory infringement where Google continued to allow known infringers to advertise using different sponsored links).  Accordingly, genuine disputes of material fact remain over contributory infringement.[11]

### C.  Direct Copyright Infringement

Atari moves for summary judgment on its copyright infringement claims based on the same facts described above.  Redbubble cross-moves for summary judgment contending (1) Atari failed to introduce the content of the work submitted with its copyright registration, (2) the volitional conduct doctrine bars liability, and (3) the Digital Millennium Copyright Act ("DMCA") protects Redbubble from liability.

#### 1.  Legal Background

To establish direct copyright infringement, a plaintiff must (1) "show ownership of the allegedly infringed material," (2) "demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106," and (3) "show causation (also referred to as 'volitional conduct') by the defendant."  *Giganews*, 847 F.3d at 666.  The exclusive rights protected by copyright law include the rights to "reproduce the copyrighted work in copies or phonorecords," "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership," and "to display the copyrighted work publicly" (for audiovisual works), among others.  17 U.S.C. § 106(1,3,5).

Under the second element, plaintiff must show "copying" of the protected work – that is, copyright law does not protect against independently created works.  *See Skidmore as Tr. of Randy*

---

[11] Atari argues that Redbubble acts with willful blindness with respect to infringement.  Willful blindness requires a party to "subjectively believe that there is a high probability that a fact exists" and "take deliberate actions to avoid learning of that fact."  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).  The Court finds that Atari has not shown that Redbubble has been willfully blind as a matter of law.

*Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).

In this context, the word "copy" does not denote "mak[ing] a copy or duplicate of." Webster's Collegiate Dictionary 276 (11th ed. 2012).  Rather, "[t]he word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989).  Thus, because the Copyright Act grants exclusive rights to the copyright owner "to distribute copies or phonorecords of the copyrighted work to the public," 17 U.S.C. § 106(3), distribution of copies of a copyrighted work satisfies the "copying" element of a copyright claim even if the distributor did not produce the copies itself.  *See, e.g.*, *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62 (1st Cir. 2002); *see also* H.R. Rep. 94-1476, at 61 (1976) (retailer who "sells copies without having anything to do with their reproduction" infringes).

Atari identifies four actions that it alleges infringe its copyrights:  (1) projecting user-uploaded designs to stock photos of physical products; (2) hiring printers to manufacture products with copyrighted designs, (3) selling products bearing copyrighted designs, and (4) publishing infringing photos on third-party websites through advertisement.  ECF No. 81 at 15:14-16:10. These actions implicate the rights to display, reproduce, and distribute protected works.  17 U.S.C. § 106(1,3,5); *Amazon*, 508 F.3d at 1159-63 (defining display and distribution rights).

Redbubble argues that Atari failed to satisfy its evidentiary burden for the first and second elements (ownership and copying) and that, even if Atari's rights were violated, Redbubble did not cause the violations under the third element (causation).

## 2.      Ownership and Copying

Copyright registration establishes a prima facie case of ownership.  17 U.S.C. § 410(c). Plaintiff may establish copying using circumstantial evidence that shows (1) "the defendant had access to the copyrighted work prior to the creation of defendant's work" and (2) "substantial similarity of the general ideas and expressions between the copyrighted work and the defendant's work."  *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984-85 (9th Cir. 2017).  Where there is no evidence of access, the two works must be "strikingly similar."  *Id.*  Demonstrating such similarity requires a side-by-side comparison.  *Experien Info. Sols., Inc. v. Nationwide Mktg.*

1     *Servs. Inc.*, 893 F.3d 1176, 1186 (9th Cir. 2018).

2        Here, Atari has introduced copyright registrations for Atari's Greatest Hit games.  ECF

3 Nos. 64-9, 64-10, as well as screenshots from those games, ECF Nos. 64-45 - 64-51, 64-37 ¶ 4.

4 Atari then introduces a side-by-side comparison of these screenshots with photos of products

5 available on Redbubble.  ECF No. 64-30; ECF No. 23 ¶¶ 7, 9.  Because the side-by-side

6 comparison shows "striking similarity" (the designs are identical), Atari has made out a prima

7 facie case of copying of the protected elements of its Greatest Hit games.

8        Redbubble nevertheless argues that Atari failed to meet its burden because the registrations

9 cover only derivative elements (i.e., elements of the new work) and because Atari failed to submit

10 the specific content submitted to the Copyright Office.  As to the first issue, because Atari

11 undisputedly owns the original works' copyrights, the registration of the subsequent work allows

12 Atari to maintain an infringement action for the original copyright.  *See Brocade Commn's Sys.,*

13 *Inc. v, A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 831528, at *4-5 (N.D. Cal. Jan 10,

14 2013) (citing *Christopher Phelps & Asssocs., LLC v. Galloway*, 492 F.3d 532, 538 (4th Cir. 2007)

15 and *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998)).  *But see Borden v.*

16 *Horwitz*, No. CV 10-00141-MWF (AJWx), 2012 WL 12877995, at *2-3 (C.D. Cal. Sept. 20,

17 2012) (distinguishing scenario where alleged copying took place after the derivative work was

18 registered).

19        As to the second issue, the screenshots of the game are sufficient to establish the content of

20 the protected audiovisual elements.  *Data E. USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207 (9th Cir.

21 1988).  Redbubble cites cases that rejected comparisons based on after-the-fact reconstructions,

22 *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1318-19 (9th Cir. 1986), and expert testimony of source

23 code similarity, *Antonick v. Electronic Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016), but those

24 cases are distinguishable because they left plaintiff with inadequate evidence to make a side-by-

25 side comparison.  *See Experian*, 893 F.3d at 1186-87.  By contrast, the Ninth Circuit requires only

26 "sufficient evidence of content to make a fair comparison."  *Id*. at 1187; *see also Epyx*, 862 F.2d at

27 207 (finding video game screen shots sufficient to make comparison).

28        Accordingly, Atari has established that the designs in Exhibit F of the Wesley Declaration

United States District Court
Northern District of California

were copied from protected audiovisual elements of Atari's works.

### 3.     Volitional Conduct and Infringement

To establish copyright infringement, Atari "must also establish causation, which is commonly referred to as the 'volitional-conduct requirement.'" *VHT*, 918 F.3d at 731 (citing *Giganews*, 847 F.3d at 666). The volitional conduct doctrine requires a party to be the "direct cause" and "actively involved" in infringement for direct liability to attach. *Id.* The doctrine arises primarily in cases where the defendant "does nothing more than operate an automated, user-controlled system." *Id.* (quoting *Am. Broad. Co., Inc. v. Aereo, Inc.*, 573 U.S. 431, 454 (2014)). In those situations, the plaintiff must provide evidence "showing the alleged infringer exercised control (other than by general operation of its website); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution of its photos." *Id.* at 732 (quoting *Giganews*, 847 F.3d at 666, 670) (quotation marks and internal brackets omitted). Volitional conduct "simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Giganews*, 847 F.3d at 666 (quoting 4 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright* § 13.08[C][1]).

In *VHT*, Zillow hosted a "listing platform" that allowed real estate agents to upload photos and information about available properties, along with a "Digs" platform in which Zillow tagged photos of "artfully designed rooms" from the listing database. *Id.* at 730. The court found that Zillow did not infringe copyrights through its listing platform because third-parties selected the displayed photos and Zillow exercised no control over content "beyond the 'general operation of its website.'" *Id.* at 733 (quoting *Giganews*, 847 F.3d at 670). Moreover, the listing platform was "constructed in a copyright-protective way," with users required to attest to the permissible use of data and Zillow invoking "copyright protective 'trumping' rules" to avoid likely infringement. *Id.* By contrast, the court noted with approval the jury verdict that Zillow was directly liable for displaying photos that its employees tagged for search on the Digs platform. *Id.* at 736. But it distinguished that verdict from "private boards" where the user instigated the photo selection and display because the system there "responds automatically to users' input without intervening

24

United States District Court
Northern District of California

1    conduct by the website owner." *Id.* at 737-38.  Accordingly, Zillow could not be directly liable for

2    infringement that occurred automatically based on users' actions.

3         The decision in *VHT* flowed from earlier cases that found providers of machines or

4    services not liable unless their conduct has "a nexus sufficiently close and causal to the illegal

5    copying that one could conclude that the [service provider] [itself] trespassed on the exclusive

6    domain of the copyright owner."  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir.

7    2004); *see, e.g.*, *Giganews*, 847 F.3d at 670 (finding server provider for peer network not directly

8    liable); *Fox Broadcasting Co., Inc. v. Dish Network, L.L.C.*, 747 F.3d 1060, 1066 (9th Cir. 2014)

9    (same for broadcast retransmitter); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d

10   121, 131 (2d Cir. 2008) (same for video recording system provider).  These cases rely on the

11   intuition that a party that merely supplies a copy machine to the public should not be directly

12   liable for others' use of that machine.  *See Aereo*, 573 U.S. at 455 (Scalia, J. dissenting); *CoStar*,

13   373 F.3d at 550; *Cartoon Network*, 536 F.3d at 132; *Religious Tech. Ctr. v. Netcom On-Line*

14   *Commn's Servs., Inc.*, 907 F. Supp. 1361, 1369 (N.D. Cal. 1995).

15        Applying these authorities, the Court finds that Redbubble does not "exercise control

16   (other than by general operation of its website)" for display rights.  Although Redbubble arguably

17   modifies the infringing images it receives from artists by applying them to stock photos of

18   physical goods such as apparel, those acts do not demonstrate the type of control that will support

19   direct liability.  Any modification occurs automatically with no intervening act by Redbubble

20   employees.  ECF No. 78 ¶ 8.  Nor does Redbubble "select any material for upload, download,

21   transmission, or storage."  These acts are performed by the website's users.  Redbubble exercises

22   no control or selection over infringing designs and cannot stop them from being uploaded.

23   Redbubble does not initiate the display of infringing images, which occurs automatically in

24   response to user actions.  Redbubble's website overall is designed in a "copyright protective" way,

25   with rules similar to those in *VHT* to protect against infringement.  Accordingly, Redbubble's only

26   "act" – providing a system where artists can upload their designs for display on a picture of a

27   product – does not subject it to direct liability because Redbubble does not select the content,

28   exercise control beyond the general operation of its website, or instigate the display.

On the other hand, there is a question of material fact whether Redbubble "instigates any copying, storage, or distribution" of infringing images.  As described in Section V.A, *supra*, Redbubble holds itself out as the seller of the goods on its website.  Redbubble offers those items for sale and then facilitates or causes their creation and delivery, with no involvement from the artists who uploaded the designs.  Even though each step is performed automatically by a computer, the acts remain volitional because Redbubble designed its software to accomplish those tasks and for its own financial benefit.  Moreover, Redbubble exercises control over every aspect of the sale, from manufacturing to shipping and returns, and thus holds the best position to prevent infringement.  Accordingly, since Redbubble actively instigates and exercises control over the sales on its website, a reasonable jury could find that Redbubble is liable for direct infringement of Atari's copyright distribution rights.  Both parties' motions for summary judgment as to Atari's claim for copyright infringement are denied.

### 4.  DMCA

Redbubble asserts that it is protected from liability by the DMCA.  Section 512(c) of the DMCA provides a safe harbor for "service providers" (defined as "a provider of online services or network access, or the operator of facilities thereof") for copyright infringement "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."[12]  17 U.S.C. § 512(c).  "To be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was stored 'at the direction of the user.'"  *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (quoting 17 U.S.C. § 512(c)(1)).  "If it meets that threshold requirement, the service provider must then show that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a 'financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'"  *Id.* (quoting 17 U.S.C. § 512(c)(1)).  Because the § 512(c) safe harbor is an affirmative

---

[12] Atari cites section 512(k)(1) to argue that Redbubble is not a service provider because it modifies content.  However, that subsection only applies to the section 512(a) safe harbor; the section 512(c) safe harbor is governed by the broader definition in section 512(k)(2).

1    defense, Redbubble must establish "beyond controversy every essential element" or lose the

2    protection of the section 512(c)'s safe harbor.  *Id.*  If Redbubble establishes this defense, it

3    remains liable for any proven infringement, but Atari can only obtain limited injunctive relief.  17

4    U.S.C. §§ 512(c)(1), 512(j).

5            The parties here initially dispute whether Redbubble's use of the artists' uploaded images

6    satisfies the "by reason of storage" requirement.  Atari contends that Redbubble's "volitional acts"

7    in copying infringing designs onto model photos to create images of products for sale, and

8    exhibiting those images on Redbubble's product pages that are hosted on its website, "distinguish

9    Redbubble from a service provider that merely provides a platform to which a third party uploads

10   infringing material."  ECF No. 64 at 30.  Redbubble responds that, "[l]ike the Amazon

11   Marketplace software, the Redbubble platform software performs functions 'for the purpose of

12   facilitating access' to the listings uploaded by third-party Sellers, and therefore satisfies this

13   element."  ECF No. 75 at 29 (citing *Milo & Gabby I,* 2015 WL 4394673 at *6).

14          "[T]he phrase "by reason of the storage at the direction of a user" covers more than "mere

15   electronic storage lockers."  *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 605-06 (9th

16   Cir. 2018) (quoting *UMG Recordings,* 718 F.3d at 1016).  For example, "[i]t allows service

17   providers to perform access-facilitating processes such as breaking up the files for faster viewing"

18   and converting them to a more user-friendly format.  *Id.*  In *Mavrix,* the court held that

19   "[i]nfringing material is stored at the direction of the user if the service provider played no role in

20   making the infringing material accessible on its site or if the service provider carried out activities

21   that were 'narrowly directed' towards enhancing the accessibility of the posts."  *Mavrix,* 873 F.3d

22   at 1056.  Courts will find the "by reason of storage" element met where the users of a website, and

23   not the website itself or the defendant's employees, "decide what to upload and what file names

24   and tags to use."  *Ventura Content*, 885 F.3d at 606.

25          There appears to be little authority on point.  Both of the cases Redbubble cites as

26   extending DMCA immunity from suit do not even discuss the "by reason of storage" element.

27   *Milo & Gabby I,* 2015 WL 4394673 at *6; *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d

28   1090, 1100 (W.D. Wash. 2004).  Redbubble cites no authority finding a failure to establish this

United States District Court
Northern District of California

element on similar facts.  *See* ECF No. 81 at 25.  Applying the principles set forth in *Ventura*

*Content*, *Mavrix*, and *UMG Recordings*, however, the Court concludes that Redbubble fails to

satisfy this element.  The images on its website are not stored "at the direction of the user" because

Redbubble actively participates in modifying the files uploaded by users to display the designs on

Redbubble-selected physical products.  *See Mavrix*, 873 F.3d at 1055 (requiring defendant to

"play[] no role" in making the infringing material accessible beyond narrow access-facilitating

conduct).  Thus, Redbubble is not entitled to the safe harbor protections of 17 U.S.C. § 512(c).

### D.     Indirect Copyright Infringement

As with trademark infringement, Atari asserts that Redbubble is liable for contributory

and vicarious infringement based on the actions of its artist users.  Atari cannot succeed on these

claims.

### 1.     Contributory Infringement

Contributory copyright infringement requires showing that defendant "(1) has knowledge

of another's infringement and (2) either (a) materially contributes to or (b) induces that

infringement."  *Visa*, 494 F.3d at 795.  Defendant must know of "specific infringing material" and

fail to "take simple measures to prevent further damage."  *Amazon*, 508 F.3d at 1171-72 (quoting

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) and *Netcom*, 907 F.

Supp. at 1375).  However, the law remains unsettled over whether "reason to know" of specific

infringement satisfies the standard.  *See Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 832 (9th

Cir. 2019) (noting inconsistency in case law).

Regardless of the precise standard for knowledge required, Atari fails to satisfy it here.

Atari provides no evidence that Redbubble knew of "specific infringing material" and failed to act.

Redbubble introduces evidence that it promptly removed any allegedly infringing listings

identified by Atari upon receiving notice.  ECF No. 80 ¶ 26; 77-1.  Although Atari claims that

additional infringing listings remain on Redbubble's website, there is no evidence that Atari

notified Redbubble of those listings.  *See* ECF No. 64-44.  Instead, Atari relies on broad "willful

blindness" claims due to "widespread infringement" on Redbubble's website.  But as explained in

Section V.B.2, *supra*, that is not sufficient.  Generalized knowledge of infringement might support

United States District Court

Northern District of California

liability only if Redbubble failed to take reasonable steps to prevent infringement, but that is not what the record shows.  Atari neither identifies affirmative steps that Redbubble took to avoid learning of infringement nor shows that Redbubble's moderation policies are unreasonable. Accordingly, Atari cannot prevail on its contributory copyright infringement claim, and Redbubble is entitled to judgment.

### 2.       Vicarious Infringement

Vicarious copyright infringement requires showing that "defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."  *Giganews*, 847 F.3d at 673; *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.").  Redbubble does not dispute that it derives a financial interest from infringement, given that it receives a fee from each sale.  *See* ECF No. 80-3 at 12.  However, Redbubble argues that it lacks practical ability to stop infringement.  *See Visa*, 508 F.3d at 1173 (requiring that defendant "has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so").

In *Napster*, an MP3 music sharing website was accused of vicariously liability for users' sharing of copyrighted songs.  239 F.3d at 1011.  Addressing the right and ability to supervise, the court found that Napster had the right to control access to its system because it reserved the right to terminate users.  *Id*. at 1023.  Although the boundaries of Napster's control were limited by the system's "architecture," Napster maintained song indices which it could use to locate infringing material and which "as a practical matter" gave it ability to stop infringement.  *Id*. at 1023-24. While users could technically alter file names, the names would have to "roughly" correspond to copyrighted music in order for users to find it through search.  *Id*. at 1024.  The court thus concluded that Napster had practical ability to supervise infringement.  *Id*.

Subsequent to *Napster*, courts frequently rejected vicarious infringement for online service providers who lacked the practical ability to stop infringement.  *See, e.g.*, *Visa*, 484 F.3d at 803-04; *Amazon*, 508 F.3d at 1174.  For example, in *Amazon*, the court found that Google lacked the ability to control infringement through its search engine because the infringement took place on

29

1    third party websites.  *Id.* at 1174.  Google also lacked practical ability to police activity because

2    policing would require it to "analyze every image on the [I]nternet, compare each image to all the

3    other copyrighted images that exist in the world," and determine infringement, which it could not

4    due absent image-recognition technology.  *Id.*  Furthermore, vicarious liability did not require

5    Google to "change its operations to avoid assisting websites to dispute their infringing content,"

6    which is properly analyzed under contributory infringement.  *Id.* at 1175.  But district courts

7    continued to find websites similar to Napster potentially liable for vicarious infringement.  *See,*

8    *e.g.*, *Keck v. Alibaba.com Hong Kong Ltd.*, 369 F. Supp. 3d 932, 936-38 (N.D. Cal. 2019).

9        In *VHT*, however, the court found that Zillow lacked practical ability to police copyright

10   infringement for real estate photos uploaded to its website.  918 F.3d at 746.  Although Zillow

11   could identify a property by its address, that was not sufficient to identify a specific product feed

12   or photo where "Zillow receives multiple copies of the same photograph, depicting the same

13   property, with the same listing agent, from different feeds."  *Id.* at 745.  Absent an image URL,

14   "ferreting out claimed infringement through use on Digs was beyond hunting for a needle in a

15   haystack."  *Id.* at 745-46.  And, as in *Amazon*, Zillow was not required to change its operations to

16   avoid assisting users' infringement under vicarious infringement.  *Id.* at 746.

17       On balance, Redbubble is closer to *VHT* than to *Napster*.  Read together, the cases require

18   a relatively close relationship between the means for finding infringement (music index, image

19   URL, etc.) and the infringing content.  Here, search terms for particular brands would presumably

20   find infringing content because, as in *Napster*, artists would tag the infringing content to enable

21   users to find it.  However, the keywords would also find a variety of non-copyrighted or fair use

22   content that happened to be tagged with the brand.  For example, Redbubble shows that a search

23   for "Atari" on Redbubble produces designs of pixelated graphics, game controllers, Isle of Dogs t-

24   shirts, "I love the 90s" stickers, and a variety of references old-school gaming.  ECF No. 80-6.

25   Also, depending on the keywords submitted by artists, word searches might be ineffective in

26   identifying some infringing content.  Moreover, Redbubble introduces evidence that it lacks

27   ability to monitor infringing images and that it requires cooperation from the content owner to

28   determine whether particular content infringes.  ECF No. 80 ¶¶ 10-18.

On these facts, the Court agrees that finding infringement would be like "searching for a needle in a haystack" (where Redbubble lacks knowledge of needles' appearance). Atari therefore cannot establish vicarious copyright infringement, and Redbubble is entitled to judgment.

### E.    Willfulness

Atari also cannot establish willfulness. Willful infringement requires showing "(1) that the infringing party was actually aware of the infringing activity, or (2) that the infringing party's actions were the result of reckless disregard, or willful blindness to, the copyright holder's rights." *VHT*, 918 F.3d at 748 (quoting *Unicolors*, 853 F.3d at 991). As described in previous sections, Atari fails to establish either knowledge or willful blindness to infringement of Atari's copyrights. Nor did Redbubble act with reckless disregard, since it promptly removed infringing listings and began to police for Atari's content. *See* ECF No. 80 ¶¶ 25-27. Redbubble's systems overall appear to be designed in a "copyright protective" way, similar to VHT's system. *See VHT*, 918 F.3d at 748-79; ECF No. 80 ¶¶ 7-27. These are simply not the facts of willful infringement. Redbubble is entitled to judgment on this claim.

### F.    Damages

Last, Redbubble moves to preclude Atari from offering a damages case because it failed to disclose to disclose damages calculations in discovery. Rule 26(a)(1)(A)(iii) requires a party to disclose "a computation of each category of damages claimed by the disclosing party" and make available "documents or other evidentiary material . . . on which the computation is based." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 821 (9th Cir. 2019). Atari broadly disclosed a statutory damages range "per infringed work" and "per type of counterfeit good." ECF No. 76-7 at 4.

There is some tension in the law concerning exclusion of evidence for failure to comply with discovery obligations. On the one hand, many cases hold that "[t]he exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*, No. 07-CV-2172-AJB, 2011 WL 672799, at *2 (S.D. Cal. Feb. 18, 2011) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)). However, before determining whether to exclude

31

1    evidence, some courts go on to "consider the following factors: '(1) the surprise to the party

2    against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3)

3    the extent to which allowing the evidence would disrupt trial; (4) the importance of the evidence;

4    and (5) the nondisclosing party's explanation for its failure to disclose the evidence.'" *Blair v.*

5    *CBE Grp., Inc.*, 309 F.R.D. 621, 626 (S.D. Cal. 2015) (quoting *Allen v. Similasan Corp.,* 306

6    F.R.D. 635, 640 (S.D. Cal. 2015)).

7            While it does not completely resolve the tension in the caselaw, the Court notes that Rule

8    37(c)(1) itself recognizes that "[i]n addition to *or instead of* this [preclusion] sanction, the court,

9    on motion and after affording an opportunity to be heard, may impose other appropriate

10   sanctions." Fed. R. Civ. 37(c)(1) (emphasis in original). "Thus, the plain text of the rule provides

11   that if an appropriate motion is made and a hearing has been held, the court does have discretion to

12   impose other, less drastic, sanctions." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir.

13   2006) (emphasis in original); *see also* Steven S. Gensler & Lumen N. Mulligan, 1 Federal Rules of

14   Civil Procedure, Rules and Commentary, Rule 37 (2021)  ("Many courts have stated that, absent a

15   showing of substantial justification or harmlessness, the exclusion sanction is 'automatic and

16   mandatory.'  Other courts, however, have rejected that view and held that trial courts retain

17   discretion to impose a sanction other than exclusion even after finding that the failure was neither

18   substantially justified nor harmless.").

19           The parties' sparse briefing does not address the foregoing considerations and is not

20   sufficient to resolve the important question of whether Atari may present a damages case.

21   Redbubble's motion to preclude Atari from presenting damages evidence is therefore denied

22   without prejudice.  The Court will conduct a case management case shortly after the issuance of

23   this order at which Redbubble may renew its motion and the Court and parties can discuss what

24   further briefing or other proceedings might be appropriate.

**CONCLUSION**

26           For the reasons set forth above, the Court DENIES Atari's motion in its entirety, GRANTS

27   Redbubble's motion on contributory and vicarious copyright infringement and willful copyright

28   and trademark infringement, and DENIES Redbubble's motion on the remaining claims.

The Court will conduct a case management conference on March 9, 2021 at 2:00 p.m.  An updated case management statement is due March 2, 2021.

**IT IS SO ORDERED.**

Dated:  January 28, 2021



JON S. TIGAR
United States District Judge